581 F.2d 157
 UNITED STATES of America for and on Behalf of CANNON AIR
CORPORATION and Fidelity and Deposit Company of
Maryland, Appellees,
v.
NATIONAL HOMES CONSTRUCTION CORPORATION and Firemen's
Insurance Company of Newark, New Jersey, Appellants,
v.
FIDELITY AND DEPOSIT COMPANY OF MARYLAND, Third-Party Plaintiff,
v.
CANNON AIR CORPORATION, Joe W. Cannon and Evelyn M. Cannon,
Third-Party Defendants.
 No. 77-1830.
 United States Court of Appeals,
Eighth Circuit.
 Submitted April 11, 1978.
Decided July 20, 1978.
 
 J. Michael Gottschalk, Kutak, Rock & Huie, Omaha, Neb., for appellant; J. Thomas Marten, Omaha, Neb., on briefs.
 Richard L. Walentine, Walsh, Walentine & Miles, Omaha, Neb., for appellees; John P. Mullen, Gaines, Otis, Mullen & Carta, Omaha, Neb., on brief.
 Before GIBSON, Chief Judge, HEANEY, Circuit Judge, and MacLAUGHLIN, District Judge.*
 HEANEY, Circuit Judge.
 
 
 1
 Cannon Air Corporation (Cannon) and its surety, Fidelity & Deposit Company of Maryland, brought an action against National Homes Construction Corporation (National) and its surety, Firemen's Insurance Company of Newark, New Jersey, for the breach of a subcontract between Cannon and National.[1] Cannon was awarded damages of $149,502.16 after a jury trial. Thereafter, National filed a motion for judgment notwithstanding the verdict or, in the alternative, for a new trial. National appeals from the denial of that motion. We affirm.
 
 
 2
 National entered into a construction contract on June 1, 1973, with the United States in which National agreed to construct 300 military family homes on the Offutt Air Force Base, Nebraska. In November, 1973, National contacted Cannon and asked it to submit a bid on the heating, ventilating and air conditioning (HVAC) work required in the homes. Cannon did so after visiting the project site and inspecting the architectural plans. After further negotiations, Cannon and National executed a subcontract about December 31, 1973.
 
 
 3
 The subcontract provided that Cannon would furnish and install the HVAC systems for $409,902. The price was evenly apportioned among the 150 buildings to be constructed. Each building contained two homes.[2] The subcontract further divided the per unit price into three payments or "draws." The first draw of $1,350 was payable on completion of the installation of heating and air conditioning ducts prior to the pouring of a concrete floor slab.[3] The second draw of $700 was payable when Cannon had finished installing the major components of the HVAC system, and the third draw of $682 was payable when Cannon had completed all its assigned work.
 
 
 4
 The subcontract also provided that payments would be made on a monthly basis. The amount of each payment was to be determined by multiplying the number of each of the three stages of work completed during the prior month by the draw for that stage. National would then retain ten percent of the total and remit the balance to Cannon.
 
 
 5
 The parties modified the monthly payment provisions of the subcontract early in the project. Under the modification, National agreed to pay Cannon for the cost of manufactured materials purchased by Cannon and stored on the project site although Cannon had not yet installed them in the buildings. As Cannon installed these materials, their value would be subtracted from the monthly payment.
 
 
 6
 Cannon began its work on the project in April, 1974, and continued to work until early January, 1975. It submitted a pay requisition form to National each month during this period. A schedule was attached to each form that identified the specific buildings and the specific draws for which payment was sought. Cannon also attached invoices from various companies showing its costs for manufactured materials and its own invoice showing the materials that it had incorporated into the project. National used these invoices to determine its inventory payments or credits.
 
 
 7
 National paid the full amount of the first eight requisitions in the sum of $257,917.55. It refused to pay the requisitions for work performed and materials purchased subsequent to October 24, 1974. It maintained that Cannon's rate of progress and quality of work were unsatisfactory. Several meetings took place between representatives of Cannon and National during December, 1974, but the parties were unable to reconcile their differences. On January 13, 1975, Cannon sent National a letter terminating the subcontract on the ground that National had wrongfully refused to pay the requisitions. National sent Cannon a letter on January 15, 1975, purporting to terminate the subcontract on the grounds that Cannon had failed to comply with the progress schedule and had not performed its work satisfactorily. Cannon filed this action shortly thereafter.
 
 I.
 
 8
 National raises several issues on appeal with respect to the amount of damages awarded by the jury. The thrust of its argument is that there is insufficient evidence to support the jury's verdict. We disagree.
 
 
 9
 Cannon's damage award is composed of three elements: (1) the value of work completed and materials added subsequent to October 24, 1974; (2) the value of extra work authorized by National but not included in the subcontract; and (3) the ten percent retention deducted by National for work performed and materials purchased prior to October 24, 1974.[4] National does not contest the award for the extra work. It does contest the awards for the other two elements.
 
 
 10
 National argues that in order to award damages for work performed under the subcontract, the jury was required to make a preliminary determination that Cannon had substantially performed those stages for which it sought payment. An analysis of the evidence reveals that Cannon sought and received damages for 125 first draws, 102 second draws, 141/2 partial second draws and 47 third draws.[5] National contends that there is insufficient evidence to sustain these figures.
 
 
 11
 National initially notes that the undisputed evidence shows that only 124 floor slabs had been poured. It argues from this evidence that it was error to allow damages for 125 first draws. We find no merit to this argument. While only 124 slabs had been poured, Cannon had completed all of the first draw installation work for three additional buildings in which the floors had not been poured. Thus, the evidence could have supported a recovery for more than 125 first draws.
 
 
 12
 With respect to the second and third draws, National contends that no credible evidence exists to support an award of 102 second draws, 141/2 partial second draws and 47 third draws. National relies principally on the testimony of Randy Sewell, a sheetmetal worker, to support this contention. Sewell, who inventoried the HVAC work done and materials remaining on the job site after Cannon left, testified that Cannon had not completed all the required installations for second and third draw work in any of the buildings for which it sought damages. National argues that Sewell's testimony was the only credible evidence the jury had in determining the amount of second and third draw work completed. We find little merit to this argument.
 
 
 13
 The jury also had before it the testimony of David Zeller, Cannon's job superintendent. With respect to the second draw work, Zeller testified that Cannon had placed rough-in duct work in 117 buildings and installed furnaces in 102 buildings. This was corroborated by National's contract progress reports to the United States Air Force and National's own internal progress reports. These show that as of mid-January, rough-in work had been completed in 123 and 132 buildings respectively. With respect to third draw work, Zeller testified that he had installed floor registers in 62 buildings, one of the final steps in the installation of the HVAC systems. Zeller's handwritten notes indicate that he had installed registers in 47 buildings. Judging the credibility of the witnesses was a task for the jury. Although conflicting evidence does exist, there was sufficient evidence to support the jury's findings.
 
 
 14
 National, alternatively, contends that simple arithmetic establishes that Cannon was entitled to an amount significantly less than the amount of the judgment. To make its point, National assumes that Cannon could recover for 125 first draws of $1,350, 117 second draws of $700 and 102 third draws of $682, or a total of $320,214.[6] It notes that National paid Cannon $257,917 for the first eight requisitions and that, therefore, Cannon was entitled to no more than $62,296.45 for work performed under the subcontract, instead of the $137,358.97 it actually received.[7] National's analysis misconstrues the modification to the subcontract. It ignores the fact that by the modification it agreed to pay for manufactured materials when they were delivered to the site. Thus, the proper measure of Cannon's performance is the amount due from completed stages of work, plus the value of materials that remained on the construction site.[8] This measure is consistent with the District Court's damage instruction and the jury's award.[9]
 
 
 15
 Finally, National maintains that the damage award must be reduced by $9,920, the amount it was required to pay for a one-year warranty on workmanship and materials for the HVAC systems. It argues that insufficient evidence was introduced at trial from which the jury could determine that Cannon, as required by the subcontract, provided such a warranty. National errs in arguing that the issue is whether Cannon continued its performance under the subcontract by providing a warranty. The issue is whether Cannon was justified in refusing to continue its performance because National materially breached the subcontract. Under the Miller Act, 40 U.S.C. § 270a Et seq., National could not recover on its counterclaim if its wrongful conduct caused the subcontractor to terminate the subcontract. See Borrett-Moore & Associates v. United States, 367 F.2d 122 (10th Cir. 1966); Wells Benz, Inc. v. United States, 333 F.2d 89, 93 (9th Cir. 1964). The jury determined that Cannon's termination of the subcontract was justified. This finding is supported by sufficient evidence. Thus, National was not entitled to recover on its counterclaim.
 
 II.
 
 16
 National also raises several evidentiary issues. It first argues that it is entitled to a new trial because Cannon introduced evidence on matters that conflicted with stipulations in the pretrial order.
 
 
 17
 The pretrial order stipulated that Joe W. Cannon, the president of Cannon, received a copy of the job specifications before submitting Cannon's bid. However, Joe Cannon testified on four occasions that he did not have in his possession the job specifications prior to making the bid. On the two occasions when Cannon inquired into the matter, National did not object to the testimony on the ground that the pretrial order had established possession.[10] Evidentiary objections must be raised at trial or they are foreclosed on appeal. United States v. Rose, 525 F.2d 1026, 1027 (2d Cir. 1975), Cert. denied, 424 U.S. 956, 96 S.Ct. 1432, 47 L.Ed.2d 362 (1976).
 
 
 18
 The pretrial order also stipulates that "no other writing or document was made or executed by Cannon or National which constitutes a modification or amendment of the subcontract." National maintains that, contrary to the stipulation, Cannon attempted to show a modification of the subcontract by introducing evidence that National waived performance of the subcontract provisions requiring outside venting of bathroom exhaust fans. The stipulation is limited to written modifications of the subcontract. The evidence relates to an oral modification. Thus, this stipulation was not violated.
 
 
 19
 National also argues that the District Court erred in admitting evidence indicating that National suffered substantial financial losses in completing its construction contract with the United States. National contends this evidence was irrelevant and that it tended to prejudice the jury. We do not agree. Such evidence was relevant to contested issues.
 
 
 20
 One of the contested issues in the trial was whether National had materially breached the subcontract by wrongfully interfering with, hindering, harassing or preventing Cannon's performance of the subcontract. Donald Turpin, National's foreman on the project, testified that Arvil Duley, National's general superintendent on the project, told him to overload Cannon to the point where it could not keep pace with the work schedule. Duley also told Turpin that the job was "in the hole" and that National could recover some money if Cannon's bonding company was brought on the job because of Cannon's nonperformance. Evidence of National's losses served to corroborate Turpin's testimony. It also tended to show that National terminated the subcontract in order to secure a financial benefit, instead of for the stated reason of Cannon's failure to comply with the progress schedule. Thus, the evidence of losses had some relevance to contested issues. A trial court has considerable discretion in weighing the probative value of the evidence against the dangers of misleading or prejudicing the jury. See Fed.R.Evid. 403. We cannot say that the District Court abused that discretion given the amount, and the complexity, of the evidence with respect to National's reasons for terminating the subcontract. See Construction, Ltd. v. Brooks-Skinner Building Company, 488 F.2d 427, 431 (3d Cir. 1973).
 
 
 21
 National finally argues that the District Court erred in admitting evidence showing National's participation in other litigation involving the Offutt project. Such evidence has a much greater potential for prejudicing a jury. The jury could reasonably draw the improper inference that National must be liable or it would not be involved in so many lawsuits.
 
 
 22
 A central issue in the case was whether Cannon had failed to meet National's progress schedule. National claimed that it was justified in terminating the subcontract and was entitled to damages because of Cannon's delay. Evidence admitted established that National was involved in other litigation in which National claimed that other subcontractors delayed the completion date of the project. This evidence tended to show that any delays were caused by the other subcontractors. The evidence was also used to impeach Duley's testimony that it was Cannon alone who was responsible for the delay of the project during the fall of 1974. Under different circumstances, we might well conclude that the probative value of this evidence was clearly outweighed by its prejudicial nature. We conclude, however, that the District Court did not abuse its discretion in admitting the evidence in light of National's repeated assertions that Cannon alone was responsible for any delays and the critical nature of this issue to the lawsuit.
 
 III.
 
 23
 National finally argues that the District Court erred in awarding costs to Cannon. National first contends that Cannon unnecessarily prolonged the action by refusing to concede certain issues. We see little merit in this contention. The issues that National maintains should have been conceded were not even wholly decided in National's favor at trial.
 
 
 24
 National also contends that Cannon's motion for taxation of costs was untimely filed. Local Rule 32(A) of the Nebraska District Court provides in part that "(t)he party entitled to recover costs shall file within 15 days after entry of judgment a verified bill of costs upon forms provided by the clerk." Judgment was entered on April 11, 1977. However, Cannon's verified bill of costs in the amount of $2,642.61 was not filed until September 28, 1977.
 
 
 25
 The District Court found that costs should be allowed because following entry of judgment, a substantial controversy existed between the parties as to the items to be included in the court's award of taxable costs. Under the circumstances, the District Court determined that Cannon's failure to file a verified bill of costs within fifteen days did not constitute a waiver of these costs. We cannot say that this decision was an abuse of the District Court's discretion. See Dickinson Supply, Inc. v. Montana-Dakota Utilities Co., 423 F.2d 106, 110 (8th Cir. 1970).
 
 
 26
 The judgment is affirmed.
 
 
 
 *
 The Honorable Harry H. MacLaughlin, United States District Judge, District of Minnesota, sitting by designation
 
 
 [1]
 Jurisdiction was based on the Miller Act, 40 U.S.C. § 270a Et seq
 
 
 [2]
 The total per unit price for each building was $2,732. The last unit had an additional unexplained charge of $102
 
 
 [3]
 The buildings did not have basements. Consequently, the heating and air conditioning ducts that would ordinarily be placed in the basement were imbedded in the concrete floors
 
 
 [4]
 Cannon utilized a chart during closing argument that detailed these elements. This chart, as well as other charts relating to the issue of damages, was allowed in the jury room without objection. The jury utilized a form of verdict that subdivided damages. It awarded Cannon $137,358.97 for unpaid labor and materials under the subcontract and $12,143.19 for extra work and material authorized by National. As these were identical to the amounts sought by Cannon, it appears that the jury awarded Cannon each of the separate damage items on the chart. See Handi Caddy, Inc. v. American Home Prod. Corp., 557 F.2d 136, 141 n. 3 (8th Cir. 1977)
 
 
 [5]
 Cannon asked the jury to award it damages for 34 first draws, 51 second draws, 141/2 partial second draws and 34 third draws for work performed subsequent to October 24, 1974. It asked damages for 91 first draws, 51 second draws and 13 third draws for work performed prior to October 24. As National had already paid Cannon all but ten percent of the amount due for work performed prior to October 24, Cannon's requested damages were limited to that amount
 
 
 [6]
 The number of draws in National's example are greater than those for which Cannon actually recovered. See n.5, Supra
 
 
 [7]
 See n.4, Supra
 
 
 [8]
 There was considerable conflict in the evidence with respect to the value of materials that remained on the construction site. Contrary to National's contentions, we find sufficient evidence in the record to sustain the jury's determination of value
 
 
 [9]
 National contends that Cannon is now attempting to support the jury verdict by application of the Quantum meruit concept which would be inconsistent with the damage instruction. This contention is erroneous. Cannon sought to justify its award only as measured by the terms of the subcontract
 
 
 [10]
 National raised no objection to the introduction of this evidence, during direct examination. During redirect examination, National objected on the ground that such evidence would contradict a subcontract term which stated that Joe Cannon had examined the specifications. National itself inquired into the matter on the remaining two occasions during cross-examination