821 F.2d 1294
 23 Fed. R. Evid. Serv. 807
 Thomas E. MORRISSEY, Individually and as the Father and
Personal Representative of the Estate of Jane
Morrissey, Deceased, and Mary Josephine
Morrissey, Individually, Appellees,
v.
WELSH COMPANY, a Corporation and Albert D. Welsh, Jr., Appellants.
Benedicte MONICAT, Appellee,
v.
WELSH COMPANY and Albert D. Welsh, Jr., Appellants.
Steven A. CRUTCHER, Appellee,
v.
WELSH COMPANY and Albert D. Welsh, Jr., Appellants.
 No. 86-1778.
 United States Court of Appeals,
Eighth Circuit.
 Submitted Jan. 14, 1987.
Decided June 12, 1987.
 
 David M. Duree, St. Louis, Mo., for appellants.
 John Dale Stobbs, Alton, Ill. and David G. Dempsey, Clayton, Mo., for appellees.
 Before LAY, Chief Judge, HEANEY and ARNOLD, Circuit Judges.
 LAY, Chief Judge.
 
 
 1
 The Welsh Company and Albert D. Welsh (hereinafter referred to collectively as "the Welsh Company"),[1] defendants in the above-entitled action, appeal from a judgment entered against them upon a jury verdict which found them jointly liable for the wrongful death of Jane Morrissey and for injuries suffered by plaintiffs Benedicte Monicat and Steven Crutcher. A five-story brick wall of a building owned by the Welsh Company collapsed during a thunderstorm and fell on a car in which Morrissey, Monicat, and Crutcher were sitting. The jury found the Welsh Company negligent in its maintenance of the wall causing the wall to collapse. The jury awarded Monicat and Crutcher damages in amounts of $15,000 and $3,000, respectively, for their personal injuries, and $750,000 each in punitive damages. On a wrongful death claim brought by Morrissey's parents, the jury awarded $6,500,000 in damages. The trial court[2] denied the defendants' motions for judgment notwithstanding the verdict and, alternatively, for a new trial. Defendants appeal.
 
 Background
 
 2
 On August 5, 1983, at approximately 4:00 p.m., Crutcher, Morrissey, and Monicat were driving north on Interstate Highway 55 heading toward downtown St. Louis, when high winds and heavy rain forced them to pull over to the side of the road. Crutcher was driving, Morrissey was seated immediately to his right, and Monicat was in the passenger seat next to her. Within seconds of when Crutcher stopped the car, the west brick wall of the Welsh building, which at one point is located just nine feet from the edge of I-55, collapsed, crushing the vehicle and trapping the three young people inside. A rescue team eventually freed them. Crutcher and Monicat escaped with relatively minor injuries, but Morrissey died at the scene.
 
 
 3
 The cause of the wall's collapse was a major issue in the case. Plaintiffs alleged that the wall, which was built between 1890 and 1910, had deteriorated, due to the Welsh Company's failure to properly maintain it, to such an extent that the failure of the wall and the possibility of personal injury was not only reasonably foreseeable, but highly probable. Although the evidence was conflicting as to certain of these allegations, the overall weight of the evidence clearly supported plaintiffs' claims. For example, plaintiffs called Louis Grabow, plant manager of the Welsh facility from 1978 until one year before the accident. As plant manager, Grabow was in charge of building repairs and maintenance. Grabow testified that during his employment, the condition of the masonry in the west wall was "fair to poor." There were a number of cracks in the wall, and bricks and windows fell from the wall on a regular basis. Grabow stated that the wood in the window frames had rotted so badly that the building would lose panes of glass whenever the wind blew, and that in a driving rain, water would come in through the windows and run down the interior walls. He eventually covered the windows with styrofoam and masonite board, which helped with the water problem, but did not prevent it.
 
 
 4
 Grabow further testified that, on a monthly basis, he sent maintenance crew members out around the building with a forklift and crate to pick up bricks that had fallen from the building. Crew members corroborated this evidence. In 1980, Grabow spoke with his supervisor about the condition of the building and was authorized to get an estimate on the repairs. The estimate for tuckpointing the entire building, replacing the windows with translucent fiberglass panels, and painting was $264,000. The supervisor later told Grabow that since they were planning to sell the building, the company did not want to incur an expenditure of that magnitude. In 1981, a windstorm blew the roof off a structure above an elevator shaft, and at another time, bricks on the north wall buckled and had to be tuckpointed. In 1982, a windowframe fell out of the fifth floor of the west wall during a storm and was replaced by concrete blocks.
 
 
 5
 John Theiss, a structural engineer retained by the Welsh Company's attorneys immediately after the collapse, was also called by the plaintiffs. Theiss concerned himself only with the remainder of the building and offered no opinion as to the cause of the collapse. Theiss found the north wall to be four inches out of plumb leaning outward. He found portions of the north, south, and east walls to be in very bad condition, with missing mortar and loose bricks. Much of the mortar that remained was powdery and disintegrating. He found the east wall to be "on the verge of collapse that could be triggered by high winds or earth tremor."
 
 
 6
 Another structural engineer, Edwin Lampitt, was called by plaintiffs. Lampitt testified that he believed the cause of the collapse was poor maintenance of the walls over a long period of time. He testified that the wind from the storm, blowing perpendicular to the wall, triggered the failure. This was about one quarter of the force that the wall should have been expected to withstand. Had the walls been pointed, the arches above the windows repaired, and other obvious repairs made, Lampitt stated that the wall would not have fallen.
 
 Discussion
 
 7
 The core of the Welsh Company's argument is that the damages awarded by the jury were excessive. It attributes the excessiveness of the verdict directly to conduct of plaintiffs' counsel in opening statement, closing argument, and during trial, as well as several prejudicial errors committed by the trial court.
 
 Punitive Damages
 
 8
 The Welsh Company alleges that the punitive damage awards of $750,000 each to Crutcher and Monicat, in view of the actual damage awards of $3,000 and $15,000 respectively, were so excessive as to require either a new trial or remittitur. It relies primarily upon the large ratios of punitive to actual damages--two-hundred-fifty to one in Crutcher's case and fifty to one in Monicat's case--arguing that a ratio of three to one would be more justifiable. The Welsh Company claims that the large awards are a direct result of the improper remarks and conduct by plaintiffs during opening statements, closing arguments, and throughout the trial.
 
 
 9
 Although punitive damages are not ordinarily allowed in negligence actions, such damages may be awarded where the tortfeasor acts with such conscious disregard for the safety of others that the law implies that an injury resulting therefrom was intentionally inflicted. See Hoover's Dairy, Inc. v. Mid-America Dairymen, Inc., 700 S.W.2d 426, 435 (Mo.1985); Jordan v. General Growth Development Corp., 675 S.W.2d 901, 905 (Mo.App.1984). Missouri has long recognized:
 
 
 10
 [T]here may be conscious negligence tantamount to intentional wrongdoing, as where the person doing the act or failing to act must be conscious of his conduct, and, though having no specific intent to injure, must be conscious, from his knowledge of surrounding circumstances and existing conditions, that his conduct will naturally or probably result in injury.
 
 
 11
 Reel v. Consolidated Investment Co., 236 S.W. 43, 46 (Mo.1921), (quoted in Hoover's Dairy, 700 S.W.2d at 435); Sharp v. Robberson, 495 S.W.2d 394, 397 (Mo.1973). Thus, the wrongful intent normally associated with punitive damage awards, see Stark v. American Bakeries Co., 647 S.W.2d 119, 123 (Mo.1983), may be implied from reckless disregard of another's rights and interests. Beggs v. Universal C.I.T. Credit Corp., 409 S.W.2d 719, 723 (Mo.1966). It is not sufficient that an unreasonable risk of bodily harm be created through the tortfeasor's actions; a high degree of probability that sustained harm will occur is required. Ferren v. Richards Manufacturing Co., 733 F.2d 526, 529 (8th Cir.1984); Hoover's Dairy, 700 S.W.2d at 436; Sharp, 495 S.W.2d at 398.
 
 
 12
 We reject the Welsh Company's claim that the trial court erred in submitting the issue of punitive damages to the jury. There was ample evidence that the Welsh Company was negligent and that its negligence rose to the level necessary under Missouri law to submit a punitive damages interrogatory to the jury. It is well established that the submission and form of issues to be decided by the jury lie within the sound discretion of the trial court and appellate review is confined to a determination of whether there was an abuse of discretion. E.I. Dupont de Nemours & Co. v. Berkley & Co., 620 F.2d 1247, 1271 (8th Cir.1980). We find no such abuse here.
 
 
 13
 We do believe, however, that the trial court erred in failing to grant the company's motion for a new trial on the issue of the excessiveness of the punitive damage awards. Ordinarily, under Missouri law the amount of a punitive damage award is a decision which lies wholly within the sound discretion of the jury. Kerr v. First Commodity Corp. of Boston, 735 F.2d 281, 289 (8th Cir.1984); Ogilvie v. Fotomat Corp., 641 F.2d 581, 587 (8th Cir.1981); Beggs, 409 S.W.2d at 724. Whether that award is excessive is a decision which rests in the first instance with the trial court, and generally a denial of a motion for a new trial on that issue will be upset only where the award would result in a plain injustice or a "monstrous or shocking result." Hollins v. Powell, 773 F.2d 191, 197 (8th Cir.1985), cert. denied, --- U.S. ----, 106 S.Ct. 1635, 90 L.Ed.2d 181 (1986); Morrill v. Becton, Dickinson & Co., 747 F.2d 1217, 1225 (8th Cir.1984). We are convinced here, however, that the punitive awards of $750,000 each for injuries warranting damages of only $3,000 and $15,000 respectively are not justified for a different reason.
 
 
 14
 Missouri law is clear that the sole purpose of punitive damages is to punish tortfeasors for egregious actions and to act as an example and deterrent to similar conduct. Armstrong v. Republic Realty Mortgage Corp., 631 F.2d 1344, 1352 (8th Cir.1980); Beggs, 409 S.W.2d at 724; Lewis v. Envirotech Corp., 674 S.W.2d 105, 113 (Mo.App.1984). As such, contrary to the Welsh Company's argument, it follows that there is no fixed relationship or maximum permissible ratio between the amount of actual damages and the amount of punitive damages. Ross v. Holton, 640 S.W.2d 166, 174 (Mo.App.1982). The punitive damage award, however, must have some correlation to the injury inflicted and the cause thereof. Ogilvie, 641 F.2d at 586; Beggs, 409 S.W.2d at 724; Ross, 640 S.W.2d at 174. We are persuaded that by considering the vast difference between the fifty to one and two-hundred-fifty to one ratios, the jury abused its discretion. Juxtaposed, the disparities in the awards reveal that the jury did not fashion the punitive damage awards to bear a relation to the injuries inflicted as is required by Missouri case law. Accordingly, we reverse and remand for a new trial on the issue of punitive damages.[3]
 
 Wrongful Death Damages
 
 15
 The Welsh Company claims that the $6.5 million wrongful death award to the Morrisseys was so excessive as to require a new trial or remittitur. We acknowledge that the jury's award is large, but we do not agree that it is so large that it be deemed excessive as a matter of law. Generally, the assessment of damages lies within the sound discretion of the jury, Herold v. Burlington Northern, Inc., 761 F.2d 1241, 1248 (8th Cir.), cert. denied, --- U.S. ----, 106 S.Ct. 208, 88 L.Ed.2d 177 (1985), and a jury in a Missouri wrongful death case will have extraordinarily wide discretion in awarding damages. Cannada v. Moore, 578 S.W.2d 597, 604 (Mo.1979). The ultimate test is what fairly and reasonably compensates the plaintiff for the injuries sustained. Coulter v. Michelin Tire Corp., 622 S.W.2d 421, 436 (Mo.App.1981), cert. denied, 456 U.S. 906, 102 S.Ct. 1752, 72 L.Ed.2d 162 (1982).
 
 
 16
 Under Missouri law, damages are permitted in wrongful death actions as follows:
 
 
 17
 In every action brought under section 537.080, the trier of the facts may give to the party or parties entitled thereto such damages as the trier of the facts may deem fair and just for the death and loss thus occasioned, having regard to the pecuniary losses suffered by reason of the death, funeral expenses, and the reasonable value of the services, consortium, companionship, comfort, instruction, guidance, counsel, training, and support of which those on whose behalf suit may be brought have been deprived by reason of such death and without limiting such damages to those which would be sustained prior to attaining the age of majority by the deceased or by the person suffering any such loss. In addition, the trier of the facts may award such damages as the deceased may have suffered between the time of injury and the time of death and for the recovery of which the deceased might have maintained an action had death not ensued. The mitigating or aggravating circumstances attending the death may be considered by the trier of the facts, but damages for grief and bereavement by reason of the death shall not be recoverable.
 
 
 18
 Mo.Rev.Stat. Sec. 537.090 (Supp.1987). In this case, the interrogatory on the verdict form only required that the jury fill in a lump sum wrongful death award. The elements of the award are not broken down for our review. However, given the evidence presented at trial, it is clear that pecuniary loss to the Morrisseys was not a factor since the Morrisseys were quite well off financially and testified that they never expected to receive any financial support from Jane. Additionally, Missouri law forbids an award for grief and bereavement by reason of the death. Thus, the elements of the award before the jury were medical and funeral expenses (stipulated at $5,634.59), loss of consortium, pain and suffering of the deceased, and aggravating circumstances.
 
 
 19
 Before 1979, Missouri permitted recovery for wrongful death only to the extent of the pecuniary loss to the decedent's survivors by reason of the death. See, e.g., Richeson v. Hunziker, 349 S.W.2d 50, 52 (Mo.1961); Domijan v. Harp, 340 S.W.2d 728, 734 (Mo.1960). This pecuinary loss was measured by the amount of financial aid which the survivors could have reasonably expected from the deceased in the future. Wright, Damage Under the Missouri Wrongful Death Act, 37 J. of Mo.Bar 92, 93 (1981) (citing Domijan, 340 S.W.2d at 734). In 1979, the Missouri General Assembly revised its wrongful death statute. Among the new provisions was one permitting recovery for "the reasonable value of the services, consortium, companionship, comfort, instruction, guidance, counsel, training, and support" of the deceased. Mo.Rev.Stat. Sec. 537.090 (Supp.1987). These damages are not limited "to those which would be sustained prior to attaining the age of majority by the deceased." Id. Thus, the Missouri statute specifically permits loss of consortium damages for the wrongful deaths of adult children as well as minor children.
 
 
 20
 It cannot be contested that children are primarily valued not for their net worth, but for the love, companionship, joy, and pride they provide for their parents. By expressly providing that damages need not be limited to the loss up to the time the child would have reached majority, the Missouri legislature recognized that a child's companionship does not terminate upon his or her emancipation, but continues until the death of either parent or child. Thus, crucial factors in the computation of consortium damages to a parent for the loss of a child must include the physical, emotional, and psychological relationship between the parents and the child. See Jones v. Carvell, 641 P.2d 105, 108 (Utah 1982).
 
 
 21
 The Welsh Company suggests that the record supports an award to the Morrisseys of no more than $50,000 for the loss of Jane's society and companionship. We believe that the evidence would support a jury finding of a much higher amount on this element of damages. It is evident that Jane Morrissey had a very close relationship with both her mother and her father. Aged twenty-two years at the time of her death, the decedent had graduated with honors from high school. She was a proficient musician and majored in French at Dennison University. In her junior year she studied abroad at the Sorbonne in France, where she did very well. Jane's father described his family as very close and testified that Jane was particularly special to him. She worked for him during the summer and when she was studying in France, he visited her and surprised her by speaking French, having taken private lessons in the language prior to the visit. Her mother also described their relationship as very close.
 
 
 22
 Although each case is to be decided on its own facts when determining whether a verdict is excessive, comparisons of compensation awarded and permitted in comparable cases can prove helpful in determining excessiveness. Kenton v. Hyatt Hotels Corp., 693 S.W.2d 83, 98 (Mo.1985); see Reben v. Ely, 146 Ariz. 309, 705 P.2d 1360 (1985) ($1,000,000 award for loss of consortium to parents of brain-damaged child upheld); May v. City of Grosse Point Park, 122 Mich.App. 295, 332 N.W.2d 411 (1982) ($1,145,000 wrongful death award to estate of 13-year-old boy; amount awarded was solely for loss of society and companionship) Cole v. Duke Power Co., 81 N.C.App. 213, 344 S.E.2d 130, cert. denied, 318 N.C. 281, 347 S.E.2d 462 (1986) ($1,500,000 compensatory damage award to estate of boy electrocuted by negligence of defendant held not excessive); Brownsville Medical Center v. Gracia, 704 S.W.2d 68 (Tex.App. 13 Dist.1985) ($500,000 award for loss of deceased child's consortium upheld); Gulf States Utilities Co. v. Reed, 659 S.W.2d 849 (Tex.App. 14 Dist.1983) ($500,000 award for loss of consortium to mother of electrocuted 13-year-old boy upheld as not excessive). It is noteworthy that damages for the loss of Jane's companionship were awarded to both of her parents. This court is extremely hesitant to upset a jury verdict reflecting loss of consortium as an element of its damage award.
 
 
 23
 The jury was also entitled to award damages for the pain and suffering of Jane Morrissey prior to her death. The evidence revealed that the decedent was conscious before she died. There was no evidence as to how long she lived or how long she remained conscious after the wall collapsed, nor was any evidence introduced as to the cause of death. Benedicte Monicat testified that before she was extracted from the wreckage, she could hear Jane moaning. A witness who tried to rescue her testified he could hear her talking under the rubble. She was crying out such things as "Help" and "I'm hurting." It took anywhere from one to two hours before rescue workers could remove Jane from the wreckage. By that time, she had died. The Welsh Company suggests that the evidence supports an award of no more than $10,000 for Jane Morrissey's pain and suffering before her death. We believe, however, that the evidence would sustain a much greater amount.
 
 
 24
 As in the case of awards for loss of consortium, awards for pain and suffering are highly subjective. Depending upon the fact situation, the range between an inadequate award for pain and suffering and an excessive award can be enormous. We have previously stated:
 
 
 25
 Assessment of damages is within the sound discretion of the jury. Each case is evaluated by a different, randomly selected group of individual jurors.
 
 
 26
 [W]e must expect substantial disparities among juries as to what constitutes adequate compensation for certain types of pain and suffering. This is a litigious fact of life of which counsel, clients and insurance carriers are fully aware. Once they place their fate in the hands of a jury, then they should be prepared for the result.... They cannot expect the Court to extricate them in all cases where the award is higher or lower than hoped for or anticipated. Taken Alive v. Litzau, 551 F.2d 196 (8th Cir.1977), quoting Mainelli v. Haberstroh, 237 F.Supp. 190, 194 (M.D.Pa.1964), aff'd 344 F.2d 965 (3rd Cir.1965).
 
 
 27
 Vanskike v. Union Pacific Railroad Co., 725 F.2d 1146, 1150 (8th Cir.1984). The evaluation of the excessiveness of a verdict is a matter which lies, in the first instance, with the trial court. Appellate courts are extremely hesitant to overturn jury verdicts which include damages for pain and suffering. See Dabney v. Montgomery Ward & Co., 761 F.2d 494, 501 (8th Cir.), cert. denied, --- U.S. ----, 106 S.Ct. 233, 88 L.Ed.2d 232 (1985); Ferren v. Richards Manufacturing Co., 733 F.2d 526, 531 (8th Cir.1984); Vanskike, 726 F.2d at 1150.
 
 
 28
 In the present case, a wall collapsed and crushed a car in which Jane Morrissey was riding. Whether she suffocated or died due to an injury or injuries she may have suffered, we do not know. What we do know is that she was conscious and able to communicate with her would-be rescuers for a short time. She was in all likelihood quite aware of the fact that she had been literally buried alive. The evidence presented was sufficient to allow a jury to reasonably infer the type of pain and terror Jane Morrissey must have gone through before her death. In a New York wrongful death case involving the stabbing of a woman who lived no more than twelve minutes, a $200,000 award for pain and suffering was held not excessive. DeLong v. County of Erie, 89 A.D.2d 376, 455 N.Y.S.2d 887 (1982). We believe that an award in excess of that amount would be well within the jury's discretion in this case.
 
 
 29
 The final element the jury could consider under the facts of this case was "aggravating circumstances." Although Missouri does not permit punitive damages per se in wrongful death cases, since 1855, it has allowed juries to consider aggravating circumstances in arriving at their verdicts. In Re Air Crash Disaster Near Chicago, Illinois, on May 25, 1979, 644 F.2d 594, 606 (7th Cir.), cert. denied, 454 U.S. 878, 102 S.Ct. 358, 70 L.Ed.2d 187 (1981). The Missouri courts consider damages for aggravating circumstances punitive in character because such an award requires proof of "willful misconduct, wantonness, recklessness, or want of care indicative of indifference to consequences." Id.; Wiseman v. Missouri Pacific Railroad Co., 575 S.W.2d 742, 752 (Mo.App.1978). The purpose of allowing consideration of aggravating circumstances, just as with punitive damages, is to punish the defendant and deter future wrongdoing. In re Air Crash, 644 F.2d at 613. The jury in the present case made clear, in its punitive damage awards to Crutcher and Monicat, that it wanted to give the Welsh Company a strong, clear message that it believed the company's conduct was worthy of punishment. Although we believe that the award of $750,000 in each of those cases was inappropriate by reason of the disproportionate correlation of the punitive damages with the actual damages, it remains to be noted that the actual damages suffered by Monicat and Crutcher were miniscule compared with those suffered by the Morrisseys. Accordingly, we believe that the jury could reasonably have allocated an amount in the millions to represent the aggravating circumstances present in this case.
 
 
 30
 It has been often said that a jury, selected from a cross-section of the community, represents the composite mores of the community. If we, as judges, embrace the jury system and endorse its constitutional foundations, we should be extremely hesitant to substitute our singular judgment and disagree with a jury verdict absent a clear miscarriage of justice evidenced by specific and objective criteria. The great benefit of a jury verdict is that it represents a composite result rendered by diverse individuals based upon their assessment of the facts and their consensus as to the policies to be applied in their community. Appellate judges do not have peremptory authority to assess the credibility of proffered evidence. We lack the capacity to weigh evidence and compute damages from a cold record. In the absence of evidentiary error, a judge who has not heard the evidence or observed the witnesses and counsel, yet expresses an opinion that a certain amount of money awarded is excessive or insufficient, merely substitutes his or her own views unchecked and undeterred by legal principles. This is not the judge's role. Appellate judges who substitute their own sense of "value," effectively abrogate the principles of the jury system. Conversely, the jury system works on the principle that each party is to be judged by the jurors as they would want to be judged themselves. Jurors labor as peers of the parties, judges do not.
 
 
 31
 In sum, we reiterate our reluctance to overturn a jury award as excessive which includes damages for loss of consortium, pain and suffering, and aggravating circumstances, especially where the trial court, which has had the benefit of observing the conduct of the trial, has declined to do so. Nonetheless, because we find prejudicial error in plaintiff's opening and closing statement, we find the sum awarded must be set aside and a new trial on damages must follow.
 
 
 32
 Plaintiff's Opening Statement and Closing Argument
 
 
 33
 Improper statements by counsel during oral arguments will constitute reversible error when those statements are plainly unwarranted and clearly injurious. Vanskike v. Union Pacific Railroad Co., 725 F.2d 1146, 1149 (8th Cir.1984). In the present case, statements of plaintiffs' counsel, both during opening statements and closing arguments, were plainly unwarranted. We cannot say on the record before us that there is no correlation between the large sum awarded for wrongful death, as well as the punitive damage awards, and the obviously prejudicial argument made by plaintiffs' counsel. In the margin, we note specifically the improper remarks by counsel.[4] Counsel's references to Thanksgiving at the Morrissey household and the loss of the "heart and soul" of a family were clearly pleas for sympathy and, particularly in the context of an opening statement, were improper. The reference to the fact that defendants would say that the accident was "God's fault" was also unwarranted. As the Missouri Court of Appeals has written: "The primary purpose of an opening statement is to acquaint the judge and jury with the nature of the case in order to enable them to understand the case and to appreciate the significance of the evidence." Missouri Commercial Investment Co. v. Employers Mutual Casualty Co., 680 S.W.2d 397, 401 (Mo.Ct.App.1984). Counsel went beyond these bounds by not only injecting argument into the opening statement, which alone is inappropriate, but improper and prejudicial argument as well.
 
 
 34
 Even more prejudicial were the arguments of counsel during final summation. Counsel made numerous appeals for sympathy and improperly suggested that the jury compare damages for the loss of Jane Morrissey's life to damages she would have received had she lost a limb or her eyesight. While we recognize that the trial court has considerable discretion in the conduct of a trial, the court's failure to sustain the Welsh Company's objection to this remark must be viewed as reversible error. See Campbell v. Coleman Co., 786 F.2d 892, 898 (8th Cir.1986). It is easy to see how a jury might rely on this statement to arrive at the high wrongful death damages they found. These damages, and the punitive damages awarded to Crutcher and Monicat, could well have been improperly influenced as well by the statement that the jury should consider, in assessing damages, how the Welsh Company acquired its wealth, "by riding over the rights of others." This is not a proper basis for a determination of damages. The question of how the company accumulated its net worth was completely irrelevant. The argument was an emotional appeal to the jury to punish the company, not because of what it had done with respect to the injured plaintiffs, but rather because of how it had operated its business, and how it had treated its employees. In effect, the Welsh Company was accused of operating a sweatshop, and the jury was invited to award large sums of money to the plaintiffs in order to punish the company for this asserted misconduct. Whether the Welsh Company did or did not operate a sweatshop is simply not relevant to the issues in this case, which must relate to and revolve around its lack of care with respect to the maintenance of its property. The failure to sustain the objection to this comment was error.
 
 
 35
 Counsel for plaintiffs suggested at oral argument that the reference to "riding over the rights of other people" did not refer to employees of the Welsh Company at all, but rather to members of the public who came in and went out of the building, and whose safety was endangered by the building's condition. It is also true, of course, that employees, as well as members of the public, were endangered by the lack of maintenance of the work place. In context, however, we do not believe that the passage above quoted can be explained away in this fashion. The reference to the signs on the wall and to the "kind of shop they had" is very plainly directed to something other than the safety of the general public. Nor can the argument be justified as merely a reference to the physical safety of the employees, who were also endangered by the deterioration of the building. Rather, it must have been understood as an invitation to visit retribution upon the Welsh Company because of its general attitude towards its employees, the implication being that wages were low and hours long.
 
 
 36
 Viewed in isolation, the individual statements by counsel may not have been so prejudicial as to deny defendants a fair trial, but taken as a whole, we believe that the cumulative effects of the numerous improper and inflammatory remarks made by plaintiffs' counsel were prejudicial. These statements substantially undermine our confidence that the verdicts returned here were not a result of the overall prejudicial statements, and we therefore reverse and remand this case for a new trial on the Morrisseys' claim, limited to the issue of damages only.[5]
 
 Insurance
 
 37
 The Welsh Company also claims that the trial court erred in two respects in admitting evidence relating to liability insurance on the building. It first claims that the court erred in denying its motion for a mistrial after plaintiffs "repeatedly, intentionally and without justification, injected the issue of liability insurance coverage into the trial." The company points to a number of instances to buttress its claim.[6] Rule 411, Federal Rules of Evidence, provides:
 
 
 38
 Evidence that a person was or was not insured against liability is not admissible upon the issue whether he acted negligently or otherwise wrongfully. The rule does not require the exclusion of evidence of insurance against liability when offered for another purpose, such as proof of agency, ownership, or control, or bias or prejudice of a witness.
 
 
 39
 In the present case, the references to insurance were not offered to prove that the Welsh Company acted negligently. The purpose was to show the reason the safety inspections were made. It is true, as the company argues, that the inspections could have been discussed without reference to insurance companies, but, as the Missouri Supreme Court has noted, not every reference to insurance constitutes reversible error. Means v. Sears, Roebuck & Co., 550 S.W.2d 780, 787 (Mo.1977). Furthermore, "the trial court is in the best position to determine whether the issue injected into the case was done in good or bad faith. The action of the trial court will not be lightly disturbed." Id. at 788.
 
 
 40
 The company also argues that the trial court erred by allowing into evidence letters and internal memoranda from the Home Insurance Company which discuss the underwriting risk as to liability, property, and workers' compensation coverages. The letters from Home to the Welsh Company discussed general housekeeping observations, such as keeping pallets out of the aisle, unnecessary combustibles out of the building, and keeping fire doors unobstructed. The company argues that these observations were made with respect to the underwriting risk of carrying workers' compensation coverage and were therefore irrelevant to the issue of the soundness of the west wall. This court will reverse the trial court's ruling on the admissibility of evidence only upon a showing of a clear and prejudicial abuse of discretion. Harris v. Union Electric Co., 787 F.2d 355, 362 (8th Cir.), cert. denied, --- U.S. ----, 107 S.Ct. 94, 93 L.Ed.2d 45 (1986). Rule 403, Fed.R.Evid., protects only against evidence which is unfairly prejudicial in that it tends to suggest that a decision be made upon an improper basis. Wade v. Haynes, 663 F.2d 778, 783 (8th Cir.1981), aff'd, 461 U.S. 30, 103 S.Ct. 1625, 75 L.Ed.2d 632 (1983); see also United States v. National Homes Construction Corp., 581 F.2d 157, 163 (8th Cir.1978). We are convinced that the admission into evidence of the questioned documents was not an abuse of discretion.
 
 
 41
 Evidence of Defects Throughout the Building
 
 
 42
 The Welsh Company contends it was reversible error for the trial court to admit evidence of the out-of-plumb condition of the east wall of the Welsh building since there was no evidence that the west wall was out-of-plumb as well. It further alleges that the court erred in admitting evidence that the roof leaked and that the sprinkler system pipes burst. "Relevant evidence" means "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Fed.R.Evid. 401. Unless relevant evidence is cumulative, causes undue delay, or is a waste of time, or its probative value is outweighed by its prejudicial effect, it is admissible. Fed.R.Evid. 403. A trial judge has wide discretion in ruling on the admissibility of evidence and his decisions thereon will not be disturbed unless there is a clear abuse of discretion. E.I. DuPont de Nemours & Co. v. Berkley & Co., 620 F.2d 1247, 1272 (8th Cir.1980). In the present case, the challenged evidence was relevant in that it reflected on the condition and maintenance of the building in general. Since the wall was destroyed in the collapse and there was no direct evidence of the structural condition of the west wall itself, this other evidence was highly relevant. The court did not err in admitting it.
 
 Jury Feelings of Sympathy or Grief
 
 43
 The Welsh Company also objects to the court's instruction to the jury during voir dire in response to a question asked of the jury panel by plaintiffs as to whether the jurors would be willing to set aside any feelings of guilt or sympathy in rendering their verdict. First, the question was a proper one. Second, the district court properly instructed the jury that although the court expects jurors to have natural sympathetic feelings, those feelings should not guide their judgment in rendering their verdict. In this instruction, we find no error.
 
 
 44
 The judgment of the district court is affirmed in part and reversed in part and the cause is remanded for retrial on the issues of the punitive damages awarded to Crutcher and Monicat; the wrongful death verdict is ordered vacated and a new trial is granted on damages only.
 
 
 
 [1]
 Albert Welsh is the 99% owner of the Welsh Company. Welsh individually holds a one-third interest in the building in question; the Welsh Company holds the remaining two-thirds ownership interest
 
 
 [2]
 The Honorable William L. Hungate, United States District Court for the Eastern District of Missouri, presiding
 
 
 [3]
 The Welsh Company requests a retrial on the issues of both liability and damages. In cases where the evidence supports a finding of liability, a new trial on both liability and damages is required only when both issues are so interwoven with each other that they cannot be tried separately. Hallberg v. Brasher, 679 F.2d 751, 758 (8th Cir.1982). In the present case, the liability and damages issues are distinct enough that a new trial only on the issue of damages is sufficient
 The company also argues that this court should grant a remittitur. We do not believe that a remittitur would be appropriate in this instance. Remittiturs are generally granted when a verdict is plainly excessive. However, where an excessive verdict is reasonably traceable to irregularities in the trial itself, we believe the better practice is to remand the case for a new trial on the issue of damages. Missouri has abolished the use of the remittitur, noting that the practice is fraught with confusion and inconsistencies. Firestone v. Crown Center Redevelopment Corp., 693 S.W.2d 99, 110 (Mo.1985). It has been challenged as an invasion of a party's right to a jury trial and an assumption of power to weigh the evidence. Id. The Missouri Supreme Court, therefore, concluded that given the broad discretion of the trial court to order a new trial where the verdict is against the weight of the evidence, remittitur practice is unnecessary and wasteful. Id. Although this court is not bound by the Firestone decision since remittitur is largely a procedural issue, and the question of whether to grant a new trial is a federal procedural question to be decided by reference to federal law, Ferren v. Richards Mfg. Co., 733 F.2d 526, 528 (8th Cir.1984), we nevertheless believe that a new trial is the appropriate remedy in this case. We adhere to the belief that a jury is the best-equipped entity to determine the size of a damage award.
 
 
 [4]
 In beginning his opening statement, plaintiffs' counsel stated: "This Thanksgiving, when a mother of seven sets her table for her family to gather, she has to remind herself not to set a place for her daugher, Jane, because the family of seven is now six." The trial court sustained the Welsh Company's objection. Counsel went on, "This case will be about the loss of a life that was needless. This case will be the story of the indifference of the building owner to the safety of any person who was around his building." To the company's objection, the court instructed plaintiffs to limit their opening statement to what the evidence is expected to prove. The court repeated its admonition to counsel upon Welsh's objection to the following statement:
 The Welsh Company will say: Well, its the young people's own fault, that it's Jane's fault, that it's Steve's fault, and it's Benedicte's fault; they're to blame for their injuries because they left a place of safety and presumably went to a place of danger.
 And then they'll also say: Well, its God's fault. God made this rainstorm that came up. And so we're not to blame; its God's fault.
 The court again repeated the same instruction, in response to the company's objection, when plaintiffs argued that defendants deny that photographs, taken at Edwin Lampitt's direction, accurately depict the condition of the building.
 Later in the opening statement, the court sustained an objection to plaintiffs' statement that, "This case is about the loss of the heart and soul of a family, the achiever in a family." Plaintiffs argued that Jane Morrissey's parents will never hear her voice again. The objection to the statement as a plea for sympathy was sustained.
 Plaintiffs' counsel made similar statements in his closing argument. He argued that Jane Morrissey's parents will never see her success, or know her marriage or the children she might have had. He continued that "the loss in this case is the loss of a precious, precious human being." Objections to these statements were sustained. An objection to plaintiffs' argument as to the meaning of companionship and comfort was also sustained; counsel stated as the constituent elements: "The pride of a college graduation. The joy of a wedding. The great joy of that first grandchild to hold in your arms." Plaintiffs also claimed that defense counsel's expression of sympathy for the victim was the first such expression from anyone in the Welsh family and that the Welsh Company spent large amounts on the defense of the case to blame everyone but himself for the collapse. Objections to both statements were sustained. At the end of plaintiffs' summation, counsel suggested:
 [I]f Jane Morrissey had lived and she had only lost her leg, you might not have had any difficulty in awarding her a million and a half, two million dollars in damages. * * * If she had lost her sight, you probably would have awarded considerably more than that.
 What did she lose, but more dear to her than her leg and her sight, more precious to her and her parents? Her life, itself.
 And in determining your verdict, you have to determine the wealth of the defendants in this case and how they got that wealth: by riding over the rights of other people. (Emphasis added).
 [Counsel for defendants]: Objection. That is improper argument. It's prejudicial.
 THE COURT: This is--counsel, this is argument; it's not evidence. The jury will evaluate it as such.
 Proceed.
 [Counsel for plaintiffs]: And, in addition to the comments that Mr. Stobbs summarized for you in his opening argument, take a look at the signs on the wall there on one of their photographs: "No loafing on the job. Keep working until the whistle blows." You know what kind of shop they had. That's how they got the money.
 
 
 [5]
 The Welsh Company requests a retrial on the issues of both liability and damages or, in the alternative, a remittur. We believe, however, that the evidence of negligence, and causation was so strong that any misconduct by plaintiffs' counsel was not prejudicial in the sense that it could have affected the jury's decision as to liability. A new trial only on the issue of damages is sufficient. See supra note 3
 
 
 [6]
 On voir dire, plaintiffs' counsel asked, "Is there any member of the panel or family member who is a policyholder, a shareholder or an employee of the Integrity Insurance Company of New Jersey or of Mission Insurance Company?" The Welsh Company's objection was overruled. Then, in opening statement, plaintiffs' counsel referred to reports from insurance company investigators, to which an objection was made, and later to an inspection by an underwriter from another insurer. At this time, the court warned counsel that the references to insurance were improper and prejudicial and admonished him not to raise the issue again
 David Welsh, testifying at trial as an adverse witness, was asked by plaintiffs whether he had ever received reports of safety inspections from any source. Welsh asked if counsel was referring to insurance reports, to which counsel replied affirmatively. In this instance, defendant himself brought out the reference to insurance. Plaintiffs also called several witnesses who were employees of various insurance companies which had provided some type of coverage, be it property, liability or workers' compensation insurance, to the Welsh Company before or at the time of the wall's collapse. Plaintiffs claim their purpose in calling the witnesses was to introduce into evidence the general condition of the building; no reference to whether the companies provided liability insurance to the Welsh Company was ever made. The company's objections to the questions asked of these witnesses were overruled, as was its motion for a mistrial. The company again raised the issue in its post-trial motion for a new trial, which was denied.