**Jodie A. LETZ, et al., Respondent,**

v.

**TURBOMECA ENGINE CORPORATION, et al., Appellant.**

**No. WD 51446.**

Missouri Court of Appeals, Western District.

Nov. 25, 1997.

Motion for Rehearing and/or Transfer to Supreme Court Denied Jan. 27, 1998.

Application for Transfer Sustained March 24, 1998.

Case Retransferred Sept. 22, 1998.

Court of Appeals Opinion Readopted Sept. 29, 1998.

---

**24.** *State ex rel. Baumruk v. Belt,* 964 S.W.2d 443, 446 (Mo. banc 1998).

**25.** 716 F.Supp. 407, 412 (W.D.Mo.1989).

**26.** *Id.* (emphasis in original).

Bryan Cave LLP, Thomas C. Walsh, David S. Slavkin, Elizabeth C. Carver, St. Louis, Douglas N. Ghertner, Kansas City, for appellants.

Gary Charles Robb, Kansas City, for respondent.

Before ULRICH, C.J., P.J., and LOWENSTEIN, BRECKENRIDGE, HANNA, SPINDEN, SMART, ELLIS, LAURA DENVIR STITH, EDWIN H. SMITH and HOWARD, JJ., and BERREY, Senior Judge.

ULRICH, Chief Judge, Presiding Judge.

Turbomeca, S.A. and Turbomeca Engine Corporation appeal the judgment of the trial court following a jury trial awarding Jodie, Eric, and Christopher Letz $70 million in a wrongful death action. The award included compensatory and punitive damages. The Letzes sued Turbomeca, S.A. (TSA), Turbomeca Engine Corporation (TEC), and Rocky Mountain Helicopters for the death of Sherry Ann Letz, the daughter of Jodie and mother of Eric and Christopher, resulting from a helicopter crash.[1] TSA, a French company, manufactured the helicopter engine on the helicopter, allegedly defective and the cause of the crash, and TEC, a wholly owned subsidiary of TSA located in Texas, installed it. Rocky Mountain Helicopters owned and operated the helicopter.

TSA and TEC allege several errors on appeal. They claim the trial court erred in (1) submitting the issue of "aggravating circumstances" to the jury, (2) submitting Instruction No. 25 and Verdict Form A regarding aggravating circumstances, (3) failing to declare a mistrial after introduction into evidence of a photograph of the decedent's gravemarker, (4) admitting evidence of the cost to recall a defective engine part and allowing plaintiffs to reference the "cost savings" of not recalling the part in arguing damages, (5) admitting evidence of facsimiles sent to the FAA after the helicopter accident regarding prior in-flight engine stoppages, and (6) denying their motion for a new trial or remittitur. The judgment of the trial court is affirmed on condition of remittitur.[2]

## FACTS

In the early morning of May 27, 1993, Sherry Letz was involved in a motor vehicle accident and was taken by ambulance to the Harrison County Community Hospital in Bethany, Missouri. She was successfully resuscitated, treated for a collapsed lung, a broken left arm, and concussion, and was stabilized. She suffered a severe trauma; and because

---

1. The helicopter crash also formed the basis of the lawsuit in the companion case, *Barnett v. Turbomeca Engine Corporation,* 963 S.W.2d 639, which is also decided this day.

2. Appellants' motion to strike portions of Respondents' supplemental legal file is denied. Appellants' motion to strike portions of Respondents' brief is denied.

the local hospital was not equipped with a CT scan, an MRI, a cardiothoracic surgeon, a neurosurgeon, or a radiologist, her treating physician ordered her transfer by helicopter to St. Luke's Hospital in Kansas City.

The Life Flight 2 helicopter departed for Kansas City just after 6:00 a.m. with Sherry, the pilot, a nurse, and a medical technician on board. Soon after the pilot gave his position report at 6:25 a.m. over Cameron, Missouri, the nurse heard a loud "pop" or "bang" in the engine. Within 15 seconds, the helicopter crashed. Sherry and the pilot were killed. The other two passengers sustained serious injuries.

The Life Flight 2 helicopter was powered by an Arriel 1B gas turbine engine manufactured by TSA. The Arriel 1B engine consisted of five modules. In June 1989, TEC installed a TU 76 modified nozzle guide vane in Module 3 of the engine.

A nozzle guide vane directs the flow of air between the first and second stage turbine disc blades. The hub, or internal envelope, is in the center of the nozzle guide vane. A crack along the front or rear flange of the hub will cause a failure in the module and a partial to complete loss of power in the engine.

TSA became aware of a cracking problem in the TU 76 nozzle guide vane in June 1985 after an in-flight failure in the Congo. In January 1986, TSA reported the failure to the French Director General of Civil Aviation, the DGAC. A second in-flight failure involving the TU 76 nozzle guide vane occurred in France in April 1986. In June and July 1986, a TSA metallurgist outlined the cracking problems with the TU 76 as a result of evaluations of in-flight failures and cracks identified during overhaul in two reports. By the summer of 1986, the highest ranking officers of TSA knew that the TU 76 cracking problems had the potential to cause in-flight engine shutdowns. They also recognized the need for modifications of the nozzle guide vane to eliminate the cracking problems.

After the 1986 reports, TSA began research for a replacement nozzle guide vane. At least three possible modifications were tested between 1987 and 1988 without success. In 1988, two new designs, the TU 202 [3] and the TU 197 [4], were developed and tested. Eventually, the two nozzle guide vanes were certified by French authorities.

During the development of a substitute nozzle guide vane, in-flight engine failures or problems involving the TU 76 nozzle guide vane continued to occur in the United States and world-wide. In the spring of 1989, an in-flight engine failure resulted in serious injury to four passengers in Bolivia. In November of 1989, the TU 76 caused an in-flight loss of power in a helicopter in Phoenix, Arizona. Two months later, another incident of engine deceleration while landing occurred in Oakland, California. In Portugal in December 1991, breakage of the second stage nozzle guide vane caused loss of power in takeoff forcing an emergency landing. TSA records reflect that six prior in-flight engine stoppages were attributable to the TU 76 nozzle guide vane beginning in 1989.

By early 1991, the substitute TU 202 and TU 197 were in production and available. TSA management, however, decided not to immediately recall helicopters equipped with the defective TU 76 nozzle guide vane for fitting with the replacements. Instead, the TU 76 was to be replaced during the regularly scheduled overhaul of the engine.

On March 11, 1991, TSA sent a service letter to all customers advising them to perform a compulsory check at least once a day for a rubbing noise in the gas generator rotating assembly of any engine containing a TU 76 nozzle guide vane. Removal of Modules 2 and 3 was recommended to customers if a continuous or loud intermittent rubbing noise was noticed. In April 1992 and February 1993, two service bulletins were issued by TSA advising customers whose helicopters were equipped with an Arriel 1 engine of the approval and availability of the TU 202 and TU 197 nozzle guide vanes and recommending their installation during a re-

---

3. This modification was to be used as a replacement part in existing engines.

4. This modification was an entirely new design to be used in newly manufactured engines.

pair procedure on the nozzle guide vane or during overhaul. A second service letter that resembled the March 11, 1991 letter was sent to customers on December 18, 1992. It again reminded customers to be attentive to an abnormal noise during engine stop. The service letters and bulletins, however, did not inform customers that the TU 76 nozzle guide vane had caused in-flight engine stoppages.

Since the certification of the TU 202 and TU 197 replacement nozzle guide vanes in 1991, at least six additional incidents of in-flight engine stoppage or loss of power in engines containing the defective TU 76 nozzle guide vane have occurred around the world. These incidents happened in Guyane, Virginia, Brazil, Arizona, Texas, and Australia.

At trial, the Letzes argued that the helicopter engine manufactured and sold by TSA and installed by TEC in the Life Flight 2 helicopter that crashed, killing Sherry, contained a defective nozzle guide vane, the TU 76, which had caused many engines to fail in flight; that TSA and TEC knew the nozzle guide vane was defective when it was installed in the Life Flight 2 helicopter in June 1989; and that TSA and TEC failed to recall the engine prior to the regularly scheduled overhaul. They asserted that TSA and TEC made a fully informed cost-based business decision not to recall the engines equipped with the defective TU 76 nozzle guide vane, including the Life Flight 2 helicopter engine, to save millions of dollars. Evidence was elicited that TSA saved up to $48 million by not conducting a recall to replace the defective TU 76 nozzle guide vane. After a four week trial, the jury returned a single verdict on all claims against TSA and TEC and assessed damages at $70 million. The jury returned a verdict in favor of Rocky Mountain Helicopters.

## I. SUBMISSION OF AGGRAVATING CIRCUMSTANCES CLAIM TO THE JURY

As their first point on appeal, TSA and TEC challenge the submissibility of aggravating circumstances. They contend that the trial court erred in overruling their motion for directed verdict at the close of all the evidence and in submitting the aggravating circumstances claim to the jury. They assert that the Letzes failed to prove (1) TSA and TEC knew or had reason to know there was a high degree of probability that the action would result in injury, (2) TSA and TEC knew of the allegedly defective condition of the TU 76 nozzle guide vane at the time it was sold or installed, or (3) TSA and TEC showed complete indifference to or a conscious disregard for the safety of others when they sold or installed the TU 76 nozzle guide vane. The Letzes argue that TSA and TEC have waived any objection they may have had to the submissibility of the aggravating circumstances claim.

### A. Preservation of Issue

To preserve the question of submissibility for appellate review in a jury-tried case, a motion for directed verdict must be filed at the close of all the evidence and, in the event of an adverse verdict, an after-trial motion for a new trial or to set aside a verdict must assign as error the trial court's failure to have directed such a verdict. *Browning v. Salem Memorial Dist. Hosp.,* 808 S.W.2d 943, 949 (Mo.App.1991). Failure to move for a directed verdict at the close of all the evidence waives any contention that plaintiff failed to prove a submissible case. *Id.* Similarly, a motion for directed verdict that does not comply with the requirements of Rule 72.01(a) neither presents a basis for relief in the trial court nor preserves the issue in the appellate court. *Dierker Assocs., D.C., P.C. v. Gillis,* 859 S.W.2d 737, 743 (Mo.App.1993); *Kincaid Enters., Inc. v. Porter,* 812 S.W.2d 892, 895 (Mo.App.1991). Rule 72.01(a) directs that "[a] motion for a directed verdict shall state the specific grounds therefor." Rule 72.01. Where an insufficient oral or written motion for directed verdict has been made, a subsequent post-verdict motion is without basis and preserves nothing for review. *Gillis,* 859 S.W.2d at 743.

TSA and TEC failed to preserve the issue of submissibility of aggravating circumstances for appellate review. In their motions for directed verdict at the close of all

the evidence, they asserted that the Letzes failed to prove their claims of negligence and strict liability in the design, manufacture, sale, or installation of the TU 76 nozzle guide vane. They did not raise the question of submissibility of aggravating circumstances in their motions. The motions for directed verdict, therefore, were insufficient to preserve the issue of submissibility of aggravating circumstances for appellate review.

## B. Plain Error Review

An appellate court, however, may review for plain error affecting substantial rights under Rule 84.13(c). *Id.* Plain error review requires a finding that manifest injustice or a miscarriage of justice resulted from the verdict. Rule 84.13(c).

■ To submit a case to the jury, every fact essential to liability must be predicated upon legal and substantial evidence. *Dildine v. Frichtel*, 890 S.W.2d 683, 685 (Mo.App. 1994). "Substantial evidence is that which, if true, has probative force upon the issues, and from which the trier of fact can reasonably decide a case." *Id.* (quoting *Hurlock v. Park Lane Medical Ctr., Inc.*, 709 S.W.2d 872, 880 (Mo.App.1985)).

■ In reviewing whether a plaintiff has made a submissible case, the evidence and all reasonable inferences to be drawn therefrom are viewed in the light most favorable to the verdict. *Dildine*, 890 S.W.2d at 685. A jury verdict will not be overturned unless there is a complete absence of probative facts to support it. *Id.*

■ Under Missouri statutory law, damages are permitted in wrongful death actions, and

> [i]n every action brought under section 537.080, the trier of the facts may give to the party or parties entitled thereto such damages as the trier of the facts may deem fair and just for the death and loss thus occasioned, having regard to the pecuniary losses suffered by reason of the death, funeral expenses, and the reasonable value of the services, consortium, companionship, comfort, instruction, guidance, counsel, training, and support of which those on whose behalf suit may be brought have been deprived by reason of such death and without limiting such damages to those which would be sustained prior to attaining the age of majority by the deceased or by the person suffering any such loss. In addition, the trier of the facts may award such damages as the deceased may have suffered between the time of injury and the time of death and for the recovery of which the deceased might have maintained an action had death not ensued. *The mitigating or aggravating circumstances attending the death may be considered by the trier of facts,* but damages for grief and bereavement by reason of the death shall not be recoverable.

§ 537.090, RSMo 1994 (emphasis added). Aggravating circumstances damages are punitive in nature. *Elliot v. Kesler*, 799 S.W.2d 97, 103 (Mo.App.1990). Their purpose is to punish the defendant and deter future wrongdoing.[5] *Id.* To submit the issue of aggravating circumstances to the jury, willful misconduct, wantonness, recklessness, or a want of care indicative of indifference to consequences must be shown. *Wiseman v. Missouri Pac. R.R. Co.*, 575 S.W.2d 742, 752 (Mo.App.1978)(quoting *Williams v. Excavating & Foundation Co.*, 230 Mo.App. 973, 93 S.W.2d 123, 127 (1936)).

■ In a negligence action, punitive damages may be awarded if the defendant knew or had reason to know a high degree of probability existed that the action would result in injury. *Stojkovic v. Weller*, 802 S.W.2d 152, 155 (Mo. banc 1991), *overruled on other grounds by Rodriguez v. Suzuki Motor Corp.*, 936 S.W.2d 104 (Mo. banc 1996); *Hoover's Dairy, Inc. v. Mid–America Dairymen Inc.*, 700 S.W.2d 426, 436 (Mo. banc 1985). To submit punitive damages to the jury in a strict liability case, a plaintiff must present evidence that the defendant placed in commerce an unreasonably danger-

---

5. Because punitive damages are extraordinary and harsh, the Missouri Supreme Court recently concluded that the higher "clear and convincing" standard of proof is required. *Rodriguez v.*

*Suzuki Motor Corp.*, 936 S.W.2d 104, 111 (Mo. banc 1996). The clear and convincing standard of proof does not apply to this case, however, because the issue was not raised or preserved.

ous product with actual knowledge of the product's defect. *Sparks v. Consolidated Aluminum Co.,* 679 S.W.2d 348, 354 (Mo.App. 1984). Under both theories, evidence must also be presented that the defendant showed a complete indifference to or conscious disregard for the safety of others.[6] *Id.; Stojkovic,* 802 S.W.2d at 155.

■ Substantial evidence adduced at trial established that TSA and TEC had actual knowledge of the defective condition of the TU 76 nozzle guide vane when it was installed in the Life Flight 2 helicopter in June of 1989. Furthermore, evidence was presented that TSA knew or had reason to know that a high degree of probability existed that the action would result in injury. TSA and TEC learned in 1985 after an in-flight engine failure in the Congo that TU 76 nozzle guide vanes in engines manufactured by TSA were cracking in the central hub and that the cracking could cause partial or total engine failure. In 1986, various comprehensive technical papers that thoroughly outlined the problem with the TU 76 were routed to TSA's highest corporate officials. In 1987, TEC mechanics began to discover and record cracks in the front and rear flanges of the central hub of TU 76 second stage nozzle guide vanes during routine engine inspections. TSA was also aware that at least three incidents of in-flight engine stoppages due to cracking of the TU 76 had occurred prior to the 1989 installation of the part by TEC in the Life Flight 2 helicopter engine. At least ten incidents of engine failure and loss of power because of TU 76 cracking and resulting disintegration occurred world-wide prior to the fatal Life Flight 2 accident. In the 1989 helicopter crash in Bolivia, four people were seriously injured after the stoppage of the helicopter engine due to a defective TU 76 nozzle guide vane.

Substantial evidence was also presented that TSA and TEC manifested indifference to or consciously disregarded the safety of others. TSA and TEC argue that the immediate undertaking of a redesign effort to produce a suitable replacement part after originally learning of the TU 76 cracking problems in 1985 and the issuance of several service letters warning of the possible problems with the TU 76 nozzle guide vane dispelled any notion that they were indifferent to the safety of others. After the development and certification of the TU 202 and TU 197 nozzle guide vanes, however, TSA and TEC made a conscious business decision not to immediately recall the defective TU 76. Instead, to save money, the companies chose to replace the defective part during the regularly scheduled overhaul of helicopter engines. Mr. Dennis Nichols, the president of TEC, acknowledged that the companies saved up to $48 million by not immediately recalling all helicopter engines equipped with the known defective part.[7] This decision was made despite internal company documentation that the TU 76 cracking problem had caused at least 13 in-flight engine failures or loss of power prior to the Life Flight 2 crash. These engine failures occurred during a time period in which TSA possessed a safe substitute nozzle guide vane.

In May 1988, despite its knowledge of in-flight failures due to the cracking of the TU 76 nozzle guide, TSA actually increased the TBO, or time between overhaul, for the Arriel 1B gas turbine, Module 3 from 2000 to 2500 hours. This extension effectively increased the opportunity for in-flight engine failures caused by the defective TU 76. The engine in the helicopter that crashed, causing the death of Sherry Letz, had operated for over 2000 hours since it was last overhauled. Sufficient evidence, therefore, was offered by the Letzes to show TSA and TEC's knowledge of the defective part; the danger it posed in the Arriel 1B gas turbine engine; and the wantonness, recklessness, and indifference to the consequences of selling and failing to recall a defective engine part manifested by the companies. Manifest injustice, therefore, did not result from submission to the jury of the issue of aggravating circumstances. Point one is denied.

## II. AGGRAVATING CIRCUMSTANCES INSTRUCTION AND VERDICT FORM

■ TSA and TEC next claim that the trial court erred in submitting Instruction

---

**6.** Both negligence and strict liability theories were submitted to the jury in this case.

**7.** See point four for a discussion of this evidence.

No. 25 and Verdict Form A to the jury. They argue that the instruction and verdict form did not provide adequate due process safeguards in instructing the jury on aggravating circumstances damages. The Due Process Clause requires that adequate standards and controls be established to prevent a punitive damages award from constituting the arbitrary deprivation of property. *Call v. Heard,* 925 S.W.2d 840, 848 (Mo. banc 1996), *cert. denied,* —— U.S. ——, 117 S.Ct. 770, 136 L.Ed.2d 716 (1997). Instruction No. 25, patterned after MAI 5.01, the damage instruction for wrongful death actions, provided:

> If you find in favor of plaintiffs, then you must award plaintiffs such sum as you believe will fairly and justly compensate the survivors of Sherry Ann Letz for any damages you believe they and the decedent sustained and the survivors of Sherry Ann Letz are reasonably certain to sustain in the future as a direct result of the fatal injury to Sherry Ann Letz.
>
> In assessing damages you may take into consideration any aggravating circumstances attendant upon the fatal injury.
>
> You must not consider grief or bereavement suffered by reason of the death.

Verdict Form A did not separate actual damages from aggravating circumstances damages.

TSA and TEC argue that the instruction violates the Missouri Supreme Court's decision in *Bennett v. Owens–Corning Fiberglas Corp.,* 896 S.W.2d 464 (Mo. banc 1995), which was handed down less than two weeks after the jury verdict was rendered in this case. In *Bennett,* the Court held that aggravating circumstances damages under the wrongful death statute are punitive in nature and may only be awarded if accompanied by due process safeguards including proper narrowing jury instructions. *Id.* at 466–467. The Court found that the jury instructions based on MAI 5.01 and a modified version of MAI 10.04 failed to adequately guide the jury in awarding such punitive damages and were, therefore, unconstitutionally vague. *Id.* at 467–468. TSA and TEC contend that *Bennett* should be applied retroactively to this

case thereby requiring a new trial on the issue of aggravating circumstances damages.

The record discloses, however, that TSA and TEC did not properly preserve this issue for appellate review. To preserve a constitutional question for appellate review, it must be raised in the trial court at the earliest opportunity consistent with good pleading and orderly procedure and be further preserved in a motion for new trial. *Hatfield v. McCluney,* 893 S.W.2d 822, 829 (Mo. banc 1995); *Fahy v. Dresser Indus., Inc.,* 740 S.W.2d 635, 639 (Mo. banc 1987), *cert. denied,* 485 U.S. 1022, 108 S.Ct. 1576, 99 L.Ed.2d 891 (1988); *State v. Danforth,* 654 S.W.2d 912, 917 (Mo.App.1983). Rule 70.03 [8], which governs objections to instructions, provides:

> Counsel shall make specific objections to instructions considered erroneous. No party may assign as error the giving or failure to give instructions unless that party objects thereto before the jury retires to consider its verdict, stating distinctly the matter objected to and the grounds of the objection.

Rule 70.03. The rule also requires that the objections must be preserved in a motion for new trial in accordance with Rule 78.07. Furthermore, to be preserved, an objection to a verdict form must be raised either at the instruction conference or when the verdict is returned by the jury before it is accepted by the court. *Adams v. Children's Mercy Hosp.,* 848 S.W.2d 535, 541 (Mo.App.1993).

TSA and TEC failed to specifically object to Instruction No. 25 and Verdict Form A prior to their submission to the jury. At the instruction conference, they sought to submit an alternative damage instruction to the trial court which omitted the aggravating circumstances paragraph. The instruction offered by TSA and TEC would not have submitted aggravating circumstances in any form. They did not, however, distinctly claim that the damage instruction violated the Due Process Clause of the United States or Missouri Constitutions or that the instruction failed to inform the jury of the purpose

---

8. Rule 70.03 became effective on January 1, 1994.

or nature of aggravating circumstances damages. TSA and TEC did not object to the language of the instruction or to the joint submission of both actual and aggravating circumstances damages. They did not ask that the verdict form require the jury to separately list its actual and aggravating circumstances awards. TSA and TEC asked only that the aggravating circumstances damages language not be submitted. Not until their motion for a new trial did they claim that a separate submission for aggravating circumstances damages was required or that greater guidance to the jury regarding assessment of such damages was required. The alleged error in submitting the instruction and verdict form to the jury was not preserved for review.

TSA and TEC argue that objecting at trial to the instruction would have been a futile act because the trial court was required to submit the instruction based on the applicable MAI 5.01. They contend that a holding requiring an objection at trial to mandatory MAI instructions would effectively require parties to raise every conceivable objection in order to preserve a potential claim for review. This contention is without merit.

In *Bennett*, the defendant objected to the constitutionality of the submission of the aggravating circumstances instruction, and the trial court modified the MAI to separately submit actual and aggravating circumstances damages. *Bennett*, 896 S.W.2d at 467. Before considering defendant's argument that the trial court improperly instructed the jury regarding aggravating circumstances damages, the Missouri Supreme Court determined that an objection to the offending instruction was preserved. *Id.* It then approved the trial court's modifying the MAI to separately submit actual and aggravating circumstances damages. *Id.* at 467–468. The Supreme Court, however, reversed the judgment, not because the trial judge modified MAI 5.01 by incorporating language of MAI 10.04, but because he had not modified MAI 5.01 further. *Id.* at 468.

In the recent case of *Call v. Heard*, 925 S.W.2d 840, 847 (Mo. banc 1996), *cert. denied*, — U.S. ——, 117 S.Ct. 770, 136 L.Ed.2d 716 (1997), the Missouri Supreme Court reaffirmed the requirement that a constitutional question, like others, must have been preserved for appellate review in order to determine the retroactive effect of the decision finding the offending instruction unconstitutional. The Court noted that the rule "is necessary in order to prevent surprise to the opposing party and to allow the trial court the opportunity to identify and rule on the issue." *Id.*

▮▮▮▮ One must object to instructions, even MAI instructions, in order to preserve objections to the giving of the instruction. Rule 70.03, cited by the Missouri Supreme Court in *Bennett*, requires, without exception, that objections to instructions must be made to preserve error for review. Rule 70.02 contemplates modification of an MAI instruction "where an MAI must be modified to fairly submit the issues in a particular case." Rule 70.02(b). Thus, the trial court has limited discretion in determining whether applicable MAI instructions "fairly submit the issues." Perceived imperfections of MAI instructions must be identified by objection in order to permit the trial judge to consider the issue and the requested deviation or the objection is waived.

▮▮▮▮ Although an applicable MAI must be given by a trial court to the exclusion of all others, *State ex rel. Missouri Highway and Transp. Comm'n v. Buys*, 909 S.W.2d 735, 739 (Mo.App.1995), an exception is that a court is not required to give an MAI instruction that violates the United States or Missouri Constitutions. If clear United States Supreme Court or Missouri Supreme Court precedent exists at the time of trial that an MAI breaches the federal constitution, the trial court need not submit the instruction to the jury. The Missouri Supreme Court has held that MAI and its Notes on Use are not binding to the extent they conflict with the substantive law. *State v. Carson*, 941 S.W.2d 518, 520 (Mo. banc 1997). If an instruction following MAI conflicts with the substantive law, any court should decline to follow MAI. *Id.* To require a trial court to submit an instruction clearly violative of the federal constitution because it was approved as an MAI prior to the ruling of the United States Supreme Court, would,

if the issue were properly preserved, render the trial voidable and meaningless. It is this type of situation that Rule 70.02 contemplates as requiring MAI modification to "fairly submit the issues."

TEC and TSA failed to raise this constitutional issue at the earliest opportunity or to specifically object to the instruction before its submission to the jury. The question of retroactive application of *Bennett*, therefore, was not preserved for review.[9] Point two is denied.

## III. PHOTOGRAPH

As their third point on appeal, TSA and TEC claim that the trial court erred in refusing to grant a mistrial after the introduction of a photograph of Sherry's tombstone. They argue that the photograph was deceitfully introduced by the Letzes' counsel for the sole purpose of inciting juror sympathy.

During her direct examination, counsel for the Letzes questioned Sherry's mother about Sherry's interests, activities, and accomplishments before her death. Numerous exhibits were introduced into evidence such as award certificates, a videotape of Sherry with her children, and photographs depicting Sherry at different stages in her life. The various photographs were offered either individually or as a group on a photo board. Just prior to introduction of the photograph of Sherry's tombstone, the jury was shown, with accompanying narration by Mrs. Letz, a photo board on which numerous photos were affixed. The photographs depicted Sherry at summer camp, in her Brownie uniform, playing the violin, on prom night, graduating from high school, celebrating her son's first Christmas, playing golf, in the hospital at the birth of her second son, and on her last Christmas. Counsel and Ms. Letz then engaged in the following colloquy:

Q: Let me show you what's been marked as Plaintiffs' Exhibit 210, and do you recognize Plaintiffs' Exhibit 210?

A: Yes, I do.

Q: Is that a photograph taken on the occasion of her 21st birthday?

A: Yes, it was.

A photograph of Sherry's tombstone taken on the date that would have been her 21st birthday anniversary was offered into evidence. Sherry's death occurred before her 21st birthday anniversary. No objection was made to the introduction of the photograph, and it was passed to the jury.

TSA and TEC claim that the Letzes' counsel "engaged in a calculated ploy to expose the jury to evidence so completely irrelevant and prejudicial that diversionary tactics were required to avoid certain objection by defendants and rejection by the court." They argue that the prejudice resulting from the introduction of the photograph, which served only to incite the sympathy of the jury, and from counsels' misconduct can only be cured by reversal of the damages judgment.

The Letzes claim that TSA and TEC waived any claim of error regarding the introduction of the photograph. They contend that the companies failed to object to the photograph's admission into evidence when it was offered at trial or to seek a withdrawal instruction.

### A. Preservation of Issue

To preserve for appellate review an error regarding the admission of evidence, a timely objection must be made when the evidence is introduced at trial. *Kovacs v. Kovacs*, 869 S.W.2d 789, 792 (Mo.App.1994). If the objection is not made at the time of the incident giving rise to the objection, the objection may be deemed waived or abandoned. *McMillin v. Union Elec. Co.*, 820 S.W.2d 352, 355 (Mo.App.1991). Similarly, failure to make a timely request for further relief when an objection has been sustained may be deemed a waiver of further remedial relief. *Id.*

In this case, the photograph was introduced into evidence and passed to the jury during the testimony of Mrs. Letz without objection. According to TSA and TEC, neither they nor the trial court saw the pic-

---

**9.** The Eighth Circuit in *Baker v. General Motors Corp.*, 86 F.3d 811 (8th Cir.Mo.1996), *cert. granted*, —— U.S. ——, 117 S.Ct. 1310, 137 L.Ed.2d 474 (1997)(No. 96–653), addressed whether *Bennett* application is retroactive. Because the issue was not preserved, the issue is not addressed.

ture before it was passed to the jury. The record reflects that TSA and TEC did not ask to see the photograph. The photograph was identified prior to trial as a numbered exhibit on the Letzes' list of exhibits and was available for review by TSA and TEC before the trial commenced. Defense counsel did not review the photograph either before trial or at trial before it was introduced.[10]

On the weekend following Mrs. Letz's testimony, counsel for TSA and TEC reviewed and compared the exhibits in the court file with their own notes and discovered the photo of Sherry's tombstone. They then brought the admission of the photograph to the court's attention and requested a mistrial. The court responded:

> Let me advise both of you that it's proper procedure for you to show the Court the exhibits before you pass them to the jury or offer them in evidence so I can look at them and see if I have any reason to not receive them. You haven't been doing that and if I had seen this photograph marked as Exhibit 210, I would not have admitted it. It has no purpose in this case other than to provoke sympathy and to work on the sympathy to the jury and it's not admissible. If that was passed to the jury, I'm not going to declare a mistrial as requested. That is denied but I certainly will advise the jury in no uncertain terms that such evidence is not to be considered.
>
> * * * * * *
>
> I'm telling you that it doesn't make any difference whether there is any objection or not. Something that is improper is not to be tendered to the jury. I don't care whether it is something that you honestly did or whether you did it by design. I assume that you did it without knowledge that this would not be admitted, but I'm

telling you that it is not admissible. It is prejudicial.

> Whether it is prejudicial to the point where a mistrial should be declared is another question and I'm determining that it is not. I'm not going to declare a mistrial. That doesn't mean that at the end of this case if something happened that showed me that this jury had been swayed by passion or by prejudice or by some improper motive in returning a verdict, you couldn't lose your verdict. So I think you should be concerned about that.
>
> Exhibit 210 is not admitted. It is withdrawn and I'll ask the defendant, how do you want me to handle it with the jury?

Because TSA and TEC failed to object to the photograph's admission when it was introduced at trial, the subsequent objection to the photograph was untimely, and any error regarding the photograph's admission was not preserved for review. The trial court, however, declared the photograph inadmissible and withdrew it from evidence despite the companies' untimely objection and offered to take corrective action. TSA and TEC requested a mistrial which the court declined. The alleged error regarding the court's refusal to grant a mistrial was preserved for review.

### B. Denial of Mistrial

■■■■ A mistrial is a drastic remedy, and the decision to grant one for misconduct or the introduction of prejudicial evidence is largely within the discretion of the trial court. *Callahan v. Cardinal Glennon Hosp.*, 863 S.W.2d 852, 867–868 (Mo. banc 1993). The trial court is better able to determine the prejudicial effect of the improper evidence and to determine whether any resulting prejudice can be ameliorated by less

---

10. Exhibits 21 and 22 included a series of photographs of the decedent at various times of her life. TSA and TEC claim that the Letzes' counsel misidentified the photograph of the decedents headstone as Exhibit 210 when showing the photograph to the jury. The photograph was actually Exhibit 21-O. Exhibit 210 was a report. TSA and TEC assert that the misidentification was intentional and a part of a scheme to surreptitiously introduce the photograph and pass it to the jury by misleading defense counsel and court and concealing from them the contents of the

photograph. The companies claim that this scheme was successful and is responsible for their failure to object to or ask to view the exhibit. When identifying the series of photographs and asking questions about them of Mrs. Letz, whether the Letzes' counsel identified the exhibit as 210 instead of 21-O is unclear. He did say, "Is this a picture taken on the occasion of her (the decedent's) 21st birthday?" The exhibit was obviously a photograph, not a report. Moreover, the photograph was introduced with numerous other photographs.

drastic means than declaration of a mistrial. *State v. Sidebottom* 753 S.W.2d 915, 919–920 (Mo. banc 1988), *cert. denied,* 488 U.S. 975, 109 S.Ct. 515, 102 L.Ed.2d 550 (1988); *McMillin v. Union Elec. Co.,* 820 S.W.2d 352, 355–356 (Mo.App.1991). A reviewing appellate court will reverse only where there has been a manifest abuse of discretion. *Callahan,* 863 S.W.2d at 867–68. To establish manifest abuse, there must be a grievous error where prejudice cannot otherwise be removed. *Id.*

■ The Letzes argue that the photograph of Sherry's gravestone was relevant to material issues such as the fact of her death and as a reminder of the finality of death. The parties, however, had stipulated to Sherry's death, and in closing argument the Letzes, through counsel, disclaimed any damages for funeral costs and burial expenses. Thus, while the photograph might have been relevant in other circumstances, it was not relevant in the circumstances presented. The photograph was offered merely to inflame the jury. Although the photograph was introduced for an improper purpose, prejudice so substantial to the opposing party to compel a mistrial does not automatically occur.

In determining the prejudicial effect of the photograph, the trial court considered the unique circumstances presented. It considered the impact of the introduction of the exhibit and the magnitude of the prejudice it engendered. In denying the motion for mistrial, the court concluded that introduction of the exhibit did not prejudice the jury to the companies' detriment.

■ The trial court did not abuse its discretion in denying the motion for mistrial. Although the method used to introduce the photograph prompts criticism, the photograph contains nothing so offensive or inciting of passion as to produce prejudice. The scene is the decedent's gravestone, surrounded by flowers. Thus, the picture does not portray a scene so offensive or prejudicial by its content to warrant a mistrial. The jury observed the photograph for a few seconds during the four-week trial during which 45 witnesses testified in person or by deposition and during which 431 exhibits were admitted.

Its consideration of the single photograph of the decedent's gravestone was not so outrageous and impacting an error that the trial court's decision not to grant a mistrial was an abuse of discretion so egregious as to necessitate a new trial. *See Callahan,* 863 S.W.2d at 867 (impact of jury questions was minimal at best where trial lasted three weeks and 26 witnesses testified).

The trial court did not abuse its discretion in refusing to grant a mistrial. Point three is denied.

## IV. COST SAVINGS EVIDENCE

■ In their fourth point, TSA and TEC claim that the trial court erred in admitting the deposition testimony of Dennis Nichols regarding the cost to recall and retrofit all TU 76 nozzle guide vanes in helicopters sold by the manufacturer and in flight status throughout the world. They also argue that the trial court erred in allowing the Letzes to use the "cost savings" evidence in arguing aggravating circumstances damages during closing argument. The deposition testimony was admissible, and the evidence presented at trial supported the Letzes' closing argument references to cost savings.

The following testimony from the videotaped deposition of Dennis Nichols, the President of TEC, was played for the jury. The questions were asked by John Risjord, who represented a party in a companion case.

Q. (By Mr. Risjord) Well, if Turbomeca, S.A. took the position when they learned of the problem and had the solution, let's assume that was in 1991, since that's the reference to—in the documents to it, they had some 2850 engines out in the world that needed either immediately or eventually that change, that improvement, right?

A. Yes.

Q. And we're told that the cost—do you know the cost of making the change?

A. No, I don't.

Q. We understand that it is in the area of $17,000 to correct this defect for one engine. Does that sound reasonable to you?

A. Sounds reasonable.

Q. Yes, sir. And so if my mathematics is correct, it would cost the manufacturer, Turbomeca, S.A., or its parent corporation, some 48 million dollars just for the replacement of the defectively designed part?

A. (Witness nods his head.)

Q. You're nodding agreement with that. I take it that that's—

A. I agree with you arithmetic.

Q. And so if the French manufacturer takes the position that we're going to wait for overhaul and we're going to be able to charge the customer for the replacement of that defective part in the overhaul, then they save as of the time back in 1991, approximately, they save approximately 48 million dollars, don't they?

\* \* \* \* \* \*

Q. (By Mr. Risjord) Well, it's a matter of simple mathematics, not speculation. If the customer pays for it, Turbomeca, S.A. or their parent company Labinal saves 48 million dollars; isn't that correct?

\* \* \* \* \* \*

A. In the scenario that you have described which is somewhat hypothetical or speculative in nature, you're right, of course. I agree.

TSA and TEC contend that the cost savings evidence was speculative and without foundation and was not an appropriate method of measuring damages in a wrongful death action.

The Letzes first assert that TSA and TEC did not preserve these alleged errors for appellate review. They claim that the defendants failed to object to the questions and answers regarding the cost savings at the time of the deposition as required by Rule 57.07(d)(3)(B). Rule 57.07(d)(3)(b) requires that some, but not all, objections be made at the deposition of a witness, or those objections are waived. *Seabaugh v. Milde Farms, Inc.*, 816 S.W.2d 202, 210 (Mo. banc 1991). It provides:

(B) Errors and irregularities occurring at the oral examination in the manner of taking the deposition, in the form of the questions or answers, in the oath or affirmation, or in the conduct of the parties and errors of any kind which might be obviated, removed, or cured if promptly presented, are waived unless seasonable objection thereto is made at the taking of the deposition.

Rule 57.07(d)(3). "The rule serves to give questioning counsel an opportunity to rephrase the question, lay a better foundation, or clarify the question so that evidence will not be rejected at trial because of inadvertent omissions or careless questions." *Seabaugh*, 816 S.W.2d at 202.

Contrary to the Letzes' contention, the record reveals that counsel for TSA and TEC specifically objected to the form of the questions asked of Mr. Nichols and to his answers regarding the cost savings. The objections stated that the questioning lacked foundation, called for speculation, and misstated the evidence. The same objections were then made at trial. The objections were timely, and the issue of whether admission of Mr. Nichols's deposition testimony was error was preserved for review.

■■■■ The Letzes also claim that TSA and TEC failed to specifically object to their cost savings argument during closing arguments. Failure to object at trial to alleged improper argument preserves nothing for review on appeal. *Krenski v. Aubuchon*, 841 S.W.2d 721, 728 (Mo.App.1992), *overruled on other grounds by Rodriguez v. Suzuki Motor Corp.*, 936 S.W.2d 104 (Mo. banc 1996). The record confirms that TSA and TEC specifically objected to the use of cost savings to argue aggravating damages. Timely objections having been made, the alleged errors were properly preserved for review.

■■■■ The trial court has substantial discretion in ruling on the admissibility of evidence. *Graves v. Atchison–Holt Elec. Coop.*, 886 S.W.2d 1, 3 (Mo.App.1994). Similarly, the regulation of closing arguments rests largely within the sound discretion of the trial court. *Hagedorn v. Adams*, 854 S.W.2d 470, 478 (Mo.App.1993). "The permissible

field of argument is broad and as long as counsel does not go beyond the evidence and issues drawn by the instructions or urge prejudicial matters or claim or defense which the evidence and issues do not justify, counsel is permitted wide latitude in his comments." *Id.* The trial court's rulings on evidence and arguments will not be disturbed on appeal absent an abuse of discretion. *Graves*, 886 S.W.2d at 3; *Hagedorn*, 854 S.W.2d at 478.

At trial, the Letzes claimed, as aggravating circumstances attending Sherry's death, that TSA and TEC knew the TU 76 nozzle guide vane was defective and the cause of several in-flight engine failures when the Life Flight 2 helicopter crashed. They also alleged that the knowledge of the defective part prompted the development and production of alternative nozzle guide vanes, the TU 197 and the TU 202, to replace the TU 76. The Letzes argued that TSA and TEC, however, did not immediately recall helicopters equipped with the TU 76 for retrofit with the safer nozzle guide vanes but, instead, waited to replace the defective parts during the helicopters' regularly scheduled overhaul to save money.

Dennis Nichols, President of TEC, and agent and representative of TSA, acknowledged during his deposition, portions of which were read to the jury, that the cost of replacing the TU 76 with a modified nozzle guide vane was approximately $17,000.[11] He stated in his deposition that the most effective and quickest means of remedying the defective engine part would have been to recall and retrofit the engines with the modified part. He also acknowledged that TSA did not recall the engines and elected to wait to replace the defective nozzle guide vane until the routine engine overhaul was performed to reduce the cost that would be incurred by the company. Mr. Nichols testi-

fied that TSA's policy was that defective nozzle guide vanes were replaced at the customer's cost when the engine was overhauled. Approximately 500 overhauls of engines containing the defective nozzle guide vane were performed by a repair facility owned by his company, TEC, and one other repair facility, both in North America, and, according to company policy, the customer was charged for each engine overhaul. The question posed to Mr. Nichols included the assumption that in 1991, 2,850 Arriel engines aboard helicopters needed either immediate or eventual replacement of the TU 76 nozzle vane guide.[12] Using these figures, the question was posed to Mr. Nichols whether TSA would have to expend $48 million to replace the defective TU 76 within engines manufactured by the company and existing in the world. He answered affirmatively.

The Letzes' premise was that the failure to *immediately recall and replace* the known defective TU 76 within helicopter engines manufactured by TSA and operating throughout the world was the consequence of a deliberate decision and was motivated by the desire to save the company $48 million. Among the evidence supporting the Letzes' argument was the deposition testimony of Alain Calemard, Vice–President for Engineering for TSA, that technical notes regarding the need to correct the defective TU 76 nozzle vain guide were written in 1986 and that six years elapsed before the company implemented the change into production engines. He stated that the commercial department of the company, responsible for determining whether TSA or the customer would pay for modification of engines, informed the engineering department that the customer could not be made to pay for the modification of the defective nozzle vain guide. The commercial department

---

11. Answers to interrogatories provided by TEC state that replacing the TU 76 with the TU 197 required 52 hours and cost $17,107.25, and replacing the TU 76 with the TU 202 required 52 hours and cost $11,519.25.

12. According to TSA technical note 9446, which was introduced at trial as Plaintiff's Exhibit 8, by December 1992, TU 76 nozzle guide vanes remained in 1769 engines of the entire TSA pro-

duced fleet. By the same time, twenty engines equipped with the TU 76 had been returned to TSA, and the TU 202 had replaced the TU 76 in 1056 engines of the fleet. The figure of 2850, therefore, is a reasonable figure for the number of engines in TSA's fleet world-wide that were equipped with the TU 76 nozzle guide vane in 1991 when the replacement TU 202 first became available.

"blocked" implementation of the modification for some undetermined period of time.

TSA and TEC argue that no foundation existed for the $48 million figure argued by plaintiffs. Mr. Nichols, however, acknowledged the $17,000 amount as an approximate cost to replace a single defective TU 76 nozzle guide vane with a TU 202 model, and he expressly accepted that 2,850 engines sold required the change. Additionally, Dr. David Hoeppner, a professor of mechanical engineering and consultant in airworthiness and reliability engineering design and quality assurance engineering design, testified in behalf of plaintiffs and agreed with Mr. Nichols that the cost of $17,000 per engine to replace the defective nozzle vane guide with the improved part was correct. Thus, these figures were supported by evidence, and the mathematical computation provided a basis for the Letzes' argument that the company decided not to recall and replace the defective engine part because it wanted to save the money such a recall would cost.

Although the defendant offered evidence that it would not have charged all customers for the repairs if done during scheduled maintenance, the jury's duty included resolving the conflict in the evidence. The cost savings realized, whether $48 million or a substantial portion of that sum, was relevant to the issue of aggravating circumstances.[13] Mr. Nichols's testimony was directly related to the companies' motive for not repairing the defective part of the helicopter engine that ultimately caused Sherry's death and,

thus, was admissible. Additionally, counsel's remarks during closing argument regarding the cost savings as a motive for failure or refusal to expedite replacement of the defective engine part, known to cause the engine to fail, were supported by evidence in the case. The cost savings evidence directly related to the issue of aggravating circumstances attending Sherry's death which was properly before the jury. Plaintiffs' counsel's argument, therefore, was permissible. Point four is denied.

## V. EVIDENCE OF FACSIMILES SENT TO FAA

TSA and TEC next claim that the trial court erred in admitting Exhibits No. 91, 248, and 250, facsimiles sent to the Federal Aviation Administration (FAA) by TSA after the Life Flight 2 accident, and in allowing witnesses to be questioned about the exhibits. The facsimiles were sent by TSA to the FAA in response to an inquiry made by the FAA in furtherance of the investigation of the cause of the Life Flight 2 crash and reported seven prior incidents/accidents caused by the TU 76 nozzle guide vane defect. TSA and TEC argue that the reports, filed after Sherry's death, were irrelevant to aggravating circumstances attending Sherry's death. They contend that the post-accident evidence was offered merely to portray the companies as misleading the United States Government regarding the number of in-flight failures the TU 76 nozzle guide had caused prior to the Life Flight 2 crash.[14]

---

13. TEC, by the deposition testimony of Carey Brown, an employee of TEC, introduced testimonial evidence that in 1993, in the normal course of business, when TEC was repairing helicopter engines sold by it in which a TU 76 nozzle guide vane was located and the engine maintenance purchased by the owner of the helicopter required that the nozzle be exposed, the company replaced the nozzle with a TU 202 nozzle "free of charge." Additionally, Mr. Brown's testimony was, "If the TU 76 nozzle guide was replaced in the course of normal overhaul or repair of the engine, some concession would be made by TEC in the course of the replacement."

14. The Letzes assert that TSA and TEC did not preserve this issue for appellate review by failing to object to the introduction of the evidence at trial and in their motion for a new trial. The record does not support the claim. The record

indubitably shows that TSA and TEC objected to the introduction of Exhibit No. 91 at trial as postaccident evidence:

THE COURT: Do you have any objections to any of these exhibits?

Defense counsel: Yes, Your Honor. I have objections to three of the exhibits and also we plan to offer two exhibits.

THE COURT: Let's get to the ones you object to.

Defense Counsel: I object to Exhibit No. 91.

THE COURT: What is the exhibit?

Defense Counsel: I believe it is a postaccident communication between Turbomeca and FAA; and the objection is that it is, in fact, postaccident evidence. It is not relevant to the issues.

Similar objections were made at trial to the introduction of Exhibit Nos. 248 and 250. Although the admission of Exhibit Nos. 248 and 250 was not raised in their motion for a new

Evidence is relevant if the fact it tends to establish tends in turn to prove or disprove a fact in issue or to corroborate evidence which is relevant and which bears on the principal issue. *Guthrie v. Missouri Methodist Hosp.*, 706 S.W.2d 938, 941 (Mo. App.1986). An award for exemplary damages such as aggravating circumstances damages must have some reasonable relation to the injury inflicted and the cause thereof. *Id.* at 942; *Vaughn v. North Am. Sys., Inc.*, 869 S.W.2d 757, 759 (Mo. banc 1994). "Actions subsequent to those for which damages are sought may be relevant and 'admissible under an issue of exemplary damages if so connected with the particular acts as tending to show defendant's disposition, intention, or motive in the commission of the particular acts for which damages are claimed.'" *Guthrie*, 706 S.W.2d at 942 (quoting *Charles F. Curry & Co. v. Hedrick*, 378 S.W.2d 522, 536 (Mo.1964)).

Exhibit No. 91, the facsimile sent by TSA to the FAA after the Life Flight 2 crash, was relevant to the issue of aggravating circumstances attending Sherry's death. TSA's report to the FAA of prior incidents/accidents involving the TU 76 nozzle guide vane tended to establish that TSA was aware of the defective condition and danger of the part prior to Sherry's death. Additionally, evidence that TSA and TEC may have under-reported prior accidents to civil authorities tended to show the companies' motive to save the cost of a recall. As discussed in the previous point, evidence was introduced at trial that TSA made a conscious decision not to immediately recall all helicopters equipped with the TU 76 nozzle guide vanes because the company would save money by delaying retrofitting the helicopters' engines with the improved part. Similarly, grounding all helicopters equipped with the TU 76 by the FAA for safety reasons after the Life Flight 2 crash would have been costly to TSA and TEC because the action would have compelled recall and the company probably would have lost sales. Although the report was sent to the FAA after the

trial, the admission of Exhibit No. 91 was raised, and, therefore, the issue regarding Exhibit 91 is preserved for appellate review. Rule 78.07;

May 27, 1993 fatal crash that killed Sherry, the report disclosed other helicopter crashes that occurred prior to the accident where the helicopters involved had the TU 76 nozzle guide vanes as engine components. The report to the FAA, therefore, tended to strengthen the Letzes contention that the companies failed to repair a known defective and dangerous part with a safe available part in order to save money. The facsimile sent to the FAA, therefore, was relevant to the issue of aggravating circumstances and was properly admitted into evidence. Point five is denied.

## VI. MOTION FOR NEW TRIAL OR REMITTITUR

In their final point on appeal, TSA and TEC claim that the trial court erred in overruling their motion for a new trial or remittitur. They argue that the $70 million wrongful death award to the Letzes (1) was grossly excessive; (2) was the product of misconduct by the Letzes' attorneys; (3) demonstrated bias, passion, and prejudice on the part of the jury; (4) exceeded fair and reasonable compensation for the Letzes' injuries; (5) was unsupported by the evidence; and (6) bore no relation to the damages authorized by the wrongful death statute, section 537.090, RSMo 1994.

In a wrongful death case, the jury has extraordinarily wide discretion in awarding damages. *Cannada v. Moore*, 578 S.W.2d 597, 604 (Mo. banc 1979). Similarly, a trial court has great discretion in approving a verdict or setting it aside as excessive. *Callahan v. Cardinal Glennon Hosp.*, 863 S.W.2d 852, 872 (Mo. banc 1993). An appellate court, therefore, "will interfere only when the verdict is so grossly excessive that it shocks the conscience of the court and convinces the court that both the jury and the trial court abused their discretion." *Fust v. Francois*, 913 S.W.2d 38, 49 (Mo.App. 1995). Abuse of discretion regarding the punitive damage award is established when the punitive damage award manifests "improper motives or a clear absence of the

*Brown v. Van Noy*, 879 S.W.2d 667, 671 (Mo. App.1994).

honest exercise of judgment." *Call v. Heard,* 925 S.W.2d 840, 849 (Mo. banc 1996), cert. denied, —— U.S. ——, 117 S.Ct. 770, 136 L.Ed.2d 716 (1997)(quoting *Beggs v. Universal C.I.T. Credit Corp.,* 409 S.W.2d 719, 724 (Mo.1966)).

## A. Review for Jury Misconduct Requiring a New Trial

An excessive verdict resulting from jury bias and prejudice requires a new trial. *Coulter v. Michelin Tire Corp.,* 622 S.W.2d 421, 436 (Mo.App.1981), *cert. denied,* 456 U.S. 906, 102 S.Ct. 1752, 72 L.Ed.2d 162 (1982). Entitlement to a new trial based on an excessive verdict requires a showing of trial court error. *Callahan,* 863 S.W.2d at 872; *Larabee v. Washington,* 793 S.W.2d 357, 359 (Mo.App.1990). The size of the verdict alone will not establish bias, passion, and prejudice by the jury. *Id.* The complaining party must show that the verdict, viewed in the light most favorable to the prevailing party, was glaringly unwarranted and that some trial error or misconduct of the prevailing party was responsible for prejudicing the jury. *Id.*

TSA and TEC fail to demonstrate that trial error or misconduct of the Letzes was responsible for prejudicing the jury. They cite to alleged trial error in the admission and use of the cost savings evidence and Exhibit 91, the facsimile sent to the FAA and the prejudicial effect of Exhibit 21–O, the photograph of Sherry's tombstone. As previously discussed, the cost savings evidence and Exhibit 91 were relevant to the issue of aggravating circumstances and were admissible. Although introduction of the photograph was improper, it was not prejudicial and did not warrant a new trial.

TSA and TEC also refer to certain remarks made by the Letzes' counsel in closing argument regarding the failure of the companies' executives to testify live[15] and to the videotaping techniques used in the depositions in arguing that the excessive verdict was a result of jury passion and prejudice. Even assuming *arguendo* that these alleged errors or misconduct were improper, they were minor and could not alone have caused the jury bias and prejudice alleged by defendants. Having failed to show that the alleged misconduct was not responsible for the large verdict, TSA and TEC are not entitled to a new trial. The verdict is, therefore, reviewed for simple excessiveness.

## B. Review For Simple Excessiveness Requiring Remittitur

Where the jury errs by awarding a verdict that is simply too bountiful under the evidence, injustice may be prevented by ordering a remittitur. *Larabee,* 793 S.W.2d at 360. The jury is culpable only of an honest mistake as to the nature and extent of the injuries, not of misconduct, and a new trial is not required. *Id.* Remittitur is appropriate "if, after reviewing the evidence in support of the jury's verdict, the court finds that the jury's verdict is excessive because the amount of the verdict exceeds fair and reasonable compensation for plaintiff's injuries and damages." § 537.068, RSMo 1994. The doctrine of remittitur is intended to produce equitable compensation, to bring jury verdicts in line with prevailing awards, and to eliminate the retrial of lawsuits. *Bishop v. Cummines,* 870 S.W.2d 922, 923 (Mo.App. 1994); *Fust,* 913 S.W.2d at 49. Determination of excessiveness is made on a case-by-case basis. *Moore v. Missouri–Nebraska Express, Inc.,* 892 S.W.2d 696, 714 (Mo.App. 1994).

As previously discussed in Point I, Missouri statutory law allows recovery for compensatory and aggravating circumstances damages in a wrongful death action. § 537.090, RSMo 1994. Aggravating circumstances awards are punitive in nature. *Bennett v. Owens–Corning Fiberglas Corp.,* 896 S.W.2d 464, 466 (Mo. banc 1995). The jury in this case returned a single verdict of $70 million after a joint submission of actual and aggravating circumstances damages.[16] Thus,

---

**15.** Most of the company executives testified by deposition.

**16.** Since the *Bennett* decision in 1995, compensatory and punitive damages are separately determined, and juries are instructed that any award for aggravating circumstances is "to punish defendant and to deter defendant and others from like conduct." *Bennett,* 896 S.W.2d at 468.

the lump sum verdict consisted of a compensatory element and a punitive element. Because the verdict did not differentiate between a compensatory award and a punitive award as now required by *Bennett*, this court has no way of knowing what amounts the jury apportioned to each element of damages. Nevertheless, the evidence related to each component of damages, compensatory and punitive, may be analyzed to determine whether the jury's $70 million verdict exceeded fair and reasonable compensation for Letzes' injuries and damages.

## C. Compensatory Damages

■■■ In ascertaining the amount of compensatory damages the jury would have awarded in this case, the evidence applicable to the wrongful death statute is considered. Compensatory damages may be awarded based on the pecuniary losses suffered by reason of the decedent's death, funeral expenses, loss of services, consortium, companionship, and comfort, and the pain and suffering experienced by the decedent because of the defendants' misconduct. Pecuniary loss may be shown through evidence of the decedent's health, character, talents, earning capacity, life expectancy, age and habits. *Kilmer v. Browning*, 806 S.W.2d 75, 81 (Mo. App.1991). Crucial factors in the computation of consortium and companionship damages to a parent for the loss of a child or to a child for the loss of a parent must include the physical, emotional, and psychological relationship between the parent and the child. *Id.; Morrissey v. Welsh Co.*, 821 F.2d 1294, 1300 (8th Cir.Mo.1987). The pain suffered by the decedent between the time of injury and death is also considered in awarding damages. *Morrissey*, 821 F.2d at 1301. The 1979 amendment to section 537.090 allows the jury to award "such damages as the deceased may have suffered between the time of injury and the time of death and for the recovery of which the deceased might have maintained an action had death not ensued."

■■■ The evidence presented at trial on the issue of compensatory damages revealed that at the time of her death in 1993, Sherry

was 20 years old, a mother of two young boys, Eric and Christopher, and the only daughter of Jodie Letz. She had a life expectancy of 60.3 additional years to age 80. The Letzes' economic expert presented evidence that the economic loss suffered by Eric and Christopher as a result of Sherry's death was $798,643. This loss included the cost of raising the children, the value of household services, the value of guidance and counseling and the value of future earnings provided to the children. Sherry's shared close relationship with her children and with her mother was also evident. Mrs. Letz testified that when Sherry was not working to provide for her children, she enjoyed spending time with them. Mother and children played together or went to the zoo or to a fair. Mrs. Letz described the relationship between Sherry and her as one of daughter and mother and of best friends. The evidence also revealed that Sherry suffered conscious physical pain between the time the helicopter crashed and her death as a direct result of the crash. The Letzes' medical expert explained that she suffered extreme breathlessness and the sensation of suffocating for up to three minutes before she died.

■■■ Along with consideration of the evidence, it is also necessary to consider compensatory awards in similar death cases to determine the amount of compensatory damages the jury would have awarded. TSA and TEC have gathered in an appendix to their brief all wrongful death awards in Missouri since 1986, consisting of 44 cases. Review of these cases reveal that most damages awards in the last ten years have ranged from about ten thousand to hundreds of thousands of dollars. In a few cases, damages in the $1 to $2 million dollar range have been affirmed on appeal.[17] *See Bennett v. Owens–Corning Fiberglas Corp.*, 896 S.W.2d 464 (Mo. banc 1995)(death involving asbestos exposure, actual damages of $1,114,00 affirmed, aggravating circumstances damages reversed for a new trial); *Goff v. St. Luke's Hosp. Of Kansas City*, 753 S.W.2d 557 (Mo. 1988)($2 million in total damages affirmed, amount of damages not appealed); *Nessel-*

17. The awards in these cases were not necessari- ly an issue on appeal.

*rode v. Executive Beechcraft Inc.*, 707 S.W.2d 371 (Mo. banc 1986)(man killed in plane crash, total damages of $1,500,000 affirmed); *Lockhart v. Middleton*, 863 S.W.2d 367 (Mo. App.1993), *cert. denied*, 511 U.S. 1131, 114 S.Ct. 2143, 128 L.Ed.2d 871 (1994)(murder, total damages of $1,350,000 affirmed); *Eagleburger v. Emerson Elec.* Co.. 794 S.W.2d 210 (Mo.App.1990)($1,060,050 in total damages affirmed); *Blum v. Airport Terminal Services, Inc.*, 762 S.W.2d 67 (Mo.App.1988)(pilot killed in plane crash, total damages of $1,500,000, including aggravating circumstances damages, found not to be excessive); *Schiles v. Schaefer*, 710 S.W.2d 254 (Mo.App.1986)(wrongful death action against doctor, clinic, and hospital, $1,220,000 in total damages affirmed). In one case, *Call v. Heard*, 925 S.W.2d 840 (Mo. banc 1996), *cert. denied*, —— U.S. ——, 117 S.Ct. 770, 136 L.Ed.2d 716 (1997), a compensatory verdict of $5 million was approved on appeal. In *Call*, a drunken driver killed *three* members of one family, including the parent who was the family's principal source of income, leaving two survivors (mother and one daughter). The $5 million compensatory verdict upheld on appeal in *Call* was part of the verdict entered by the court in the judge-tried case. No reported Missouri case disclosed a jury verdict compensating a plaintiff for loss in a wrongful death case in a sum approaching $5 million.[18] A survey of all these cases and consideration of the evidence in this case in the light most favorable to the plaintiffs convinces this court that a compensatory award for the death of Sherry, if separately delineated, would not have exceeded $2.5 million.

## D. Punitive Damages

 Having determined that the jury's compensatory damages award would not have exceeded $2.5 million, punitive damages awarded by the jury in this case necessarily amounted to $67.5 million. Punitive damages may properly be imposed to further society's interests of punishing unlawful con-

duct and deterring its repetition. *BMW v. Gore*, 517 U.S. 559, 567, 116 S.Ct. 1589, 1595, 134 L.Ed.2d 809 (1996). The imposition of a punitive award implicates Fourteenth Amendment due process concerns. *Honda Motor Co., Ltd. v. Oberg*, 512 U.S. 415, 114 S.Ct. 2331, 129 L.Ed.2d 336 (1994). "A decision to punish a tortfeasor by means of an exaction of exemplary damages is an exercise of state power that must comply with the Due Process Clause of the Fourteenth Amendment." *Id.* at 434, 114 S.Ct. at 2342. The constitutional concerns are both procedural and substantive. *See BMW*, 517 U.S. at 559, 116 S.Ct. at 1589. Procedurally, the "traditional common law approach," which includes proper jury instruction and review of a jury award by the trial court and an appellate court, generally satisfies due process. *See Pacific Mut. Life Ins. Co. v. Haslip*, 499 U.S. 1, 15, 111 S.Ct. 1032, 1041–1042, 113 L.Ed.2d 1 (1991). Substantively, when an award can fairly be categorized as "grossly excessive" in relation to the interests of punishment and deterrence, it penetrates the "zone of arbitrariness" that violates the Due Process Clause of the Fourteenth Amendment. *BMW*, 517 U.S. at 568, 116 S.Ct. at 1595. Although a "mathematical bright line" test does not exist to determine the constitutionality of a punitive damage award, limitations on the finder of fact's discretion and "general concerns of reasonableness ... enter into the constitutional calculus." *Haslip*, 499 U.S. at 18, 111 S.Ct. at 1043. To satisfy the due process and reasonableness requirements, the amount of punitive damages should reflect the enormity of the defendant's offense and be related to actual or potential harm resulting therefrom. *BMW*, 517 U.S. at 575, 116 S.Ct. at 1599; *Call*, 925 S.W.2d at 848.

 In reviewing a punitive damages award for excessiveness, due process and reasonableness requirements compel consideration of the degree of reprehensibility of

18. In closing argument, plaintiffs' counsel attempted to persuade the jury that $48 million represented the value of Sherry's life because that was the potential amount TSA and TEC saved by avoiding a recall. Money saved by a defendant's conscious disregard for public safety is not a proper consideration for compensatory damages under section 537.090. The motivation to save $48 million in exchange for the continued risk to people transported by helicopters powered by engines containing the defective TU 76 nozzle guide vane was properly considered, however, as a matter of aggravating circumstances as discussed *infra* in section D.1.

the defendant's conduct, the relationship between the punitive damages award and the harm or potential harm suffered by the plaintiff, and the difference between the award and the civil penalties authorized or imposed in comparable cases. *BMW*, 517 U.S. at 573–576, 116 S.Ct. at 1598–1599. Missouri courts have also considered the following additional factors [19] in determining the propriety of a punitive damages award: (1) aggravating and mitigating circumstances surrounding the defendant's conduct; (2) the degree of malice or outrageousness of the defendant's conduct; (3) the defendant's character, financial worth, and affluence; (4) the age, health, and character of the injured party; (5) the nature of the injury; (6) awards given and approved in comparable cases; [20] and (7) the superior opportunity for the jury and trial court to appraise the plaintiff's injuries and other damages. *Call*, 925 S.W.2d at 849; *Moore*, 892 S.W.2d at 714; *Larabee*, 793 S.W.2d at 360. Missouri's requirements for the imposition of punitive damages satisfy the due process concerns expressed by the Supreme Court of the United States in *Haslip*. *Call*, 925 S.W.2d at 850.

### 1. Degree of Reprehensibility of TSA and TEC

■ The degree of reprehensibility of a defendant's conduct is, perhaps, the most important indicium of the reasonableness of a punitive damages award. *BMW*, 517 U.S. at 575, 116 S.Ct. at 1599. Substantial evidence of aggravating circumstances enveloping Sherry's death was introduced at trial. The top-level executives of TSA and TEC knew of the history of the TU 76 nozzle guide vane, its propensity to crack, and the risk of in-flight engine failures. They knew the TU 76 nozzle guide vane had failed during engine operation causing the affected engines to cease functions, and they knew that helicopters had crashed because the TU 76 nozzle had failed. Because they knew of the propensity of the part to fail, they developed and

possessed a safe nozzle guide vane to replace the defective part. The companies, however, did not recall helicopter engines to replace the defective TU 76 but, instead, delayed the retrofit until each engine was overhauled during regularly scheduled maintenance. Despite the companies' awareness of the defective part, the recommended length between overhauls was lengthened by the companies from 2,000 hours of engine use to 2,500 hours. The business decision to not immediately recall the helicopter engines for retrofit was influenced by the desire to save TSA and TEC millions of dollars—potentially as much as $48 million.

■ A defendant's choice to wantonly disregard the interests of those to whom some duty is owed to avoid incurring a cost is considered in determining whether a punitive award is reasonably related to the goals of deterrence and retribution. *Haslip*, 499 U.S. at 22, 111 S.Ct. at 1045–1046. TSA and TEC's knowledge of the propensity of the TU 76 nozzle guide vanes to crack and fail, thereby causing the engine in which it was located to malfunction; their knowledge that the defective part had caused helicopter crashes; their failure or refusal to warn of the defective part and the potential consequences of its failure and to recall the engines containing the defective part or otherwise provide for its replacement; their extension of the length of time between overhauls of engines containing the part at which time the part would be replaced from 2,000 to 2,500 hours of engine operating time; and the death to Sherry Ann Letz resulting from the conscious indifference manifested by the policy decisions of the companies to save potentially as much as $48 million dollars by not repairing the defective part warrant a substantial punitive damage award.[21] Thus, based on the evidence of TSA's and TEC's indifference to the safety of others and the profitability of the company's wrongful conduct, an award

---

**19.** Not all of the factors are necessarily discussed in a particular case.

**20.** This factor is no longer the sole factor considered in evaluating the excessiveness of a jury award. *Larabee,* 793 S.W.2d at 360.

**21.** The conduct of defendants in places other than Missouri specifically impacted on residents of this state and directly resulted in the death of Sherry Ann Letz.

totaling millions of dollars is not unreasonable.

### 2. Ratio of Punitive Damages to the Actual Harm Inflicted on the Plaintiff

 Exemplary damages must bear a reasonable relationship to compensatory damages. *BMW,* 517 U.S. at 580, 116 S.Ct. at 1601. The ratio of punitive and actual damages is a commonly cited indicium of an unreasonable or excessive punitive damages award. *Id.* The United States Supreme Court has long endorsed the proposition that a comparison between the punitive award and the compensatory award is significant. *Id.* at 580–582, 116 S.Ct. at 1601–1602.

In *Haslip,* the United States Supreme Court concluded that a punitive damages award of "more than 4 times the amount of compensatory damages" was close to being excessive. *Id.* at ——, 116 S.Ct. at 1602 (quoting *Haslip,* 499 U.S. at 23–24, 111 S.Ct. at 1046–1047). It then refined its analysis of excessiveness in *TXO Production Corp. v. Alliance Resources Corp.,* 509 U.S. 443, 460, 113 S.Ct. 2711, 2721–2722, 125 L.Ed.2d 366 (1993), stating that the proper inquiry was "whether there is a reasonable relationship between the punitive damages award and the harm likely to result from the defendant's conduct as well as the harm that actually occurred." In *TXO,* the Court determined that it would not rule out a large ratio of punitive to compensatory damages (526 to 1) when the actual damages were relatively small ($19,000) because the misconduct was part of a large pattern of outrageous conduct and the harm likely to result from defendant's misconduct was much larger. *Id.* at 462, 113 S.Ct. at 2722–2723. Thus, the Court reasoned that the relative ratio of punitive award to likely harm was not more than 10 to 1. *Id.* In *BMW,* the Court continued to reject the concept that "the constitutional line is marked by a simple mathematical formula" but noted that "low awards of compensatory damages may properly support a higher ratio than high compensatory awards if, for example, a particularly egregious act has resulted in only a small amount of economic damages." *BMW,* 517 U.S. at ——, 116 S.Ct. at 1602.

In the present case, the verdict amounted to no more than $2.5 million for compensatory damages and at least $67.5 million for aggravating circumstances damages. Thus, the verdict represents a ratio of punitive sanction to compensatory award of at least 27 to 1, an arguably high ratio. The actual result of the conduct of TSA and TEC, the death of a passenger of a helicopter equipped with a defective TU 76 nozzle guide vane, was relatively proportionate to the harm likely to result from the conduct. This case, therefore, was dissimilar to *TXO,* where the defendants caused only a small part of the damage they would have caused if allowed to continue their scheme. Moreover, the economic or actual damages were not small as in *TXO,* but were large, up to $2.5 million. The amount of the compensatory award, therefore, did not arguably merit a higher ratio.

### 3. Review of Similar Cases

As with the compensatory award, examination of other cases and awards is helpful in determining whether the award of $67.5 million is excessive and shocks the conscience of the court. Because the maximum award permissible under the evidence of a given case cannot be calculated with a precise mathematical formula, *Kenton v. Hyatt Hotels Corp.,* 693 S.W.2d 83, 98 (Mo. banc 1985), comparison to similar cases where a defendant showed a conscious disregard for public safety to save money is helpful in determining what award would fairly and reasonably compensate the Letzes. In *Morrissey v. Welsh Co.,* 821 F.2d 1294 (8th Cir.Mo.1987), the Eighth Circuit, applying Missouri law, held that an award of $6.5 million in an action for wrongful death of plaintiff's 22–year old daughter who was killed when a building wall collapsed on her automobile was not so large to be deemed excessive as a matter of law. *Id.* at 1299. The court explained that where the wall collapsed due to poor maintenance over a long period of time and where the owners of the building decided not to incur an expenditure of $264,000 to repair the entire building because it would soon be sold, the jury could reasonably have allocated $6.5

million to represent the aggravating circumstances present in the case. *Id.* at 1302.

In another comparable case, *Grimshaw v. Ford Motor Co.*, 119 Cal.App.3d 757, 174 Cal.Rptr. 348 (Cal.Ct.App.1981), a passenger, who suffered severe and permanently disfiguring burns on his face and entire body in an automobile accident, brought a products liability action against the manufacturer of the automobile, Ford Motor Company. *Id.* 174 Cal.Rptr. at 358. At the trial, evidence was presented that during the development of the automobile, the manufacturer knew of the fuel tank's vulnerability to puncture and rupture at low rear impact speeds creating a significant risk of death or injury from fire and had the technology to substantially reduce the risk. *Id.* at 360–361. Instead, the company elected to go forward with the production of the car based on the cost savings that would inure from omitting or delaying the "fixes." *Id.* at 361.

The jury awarded the plaintiff $2,516,000 in compensatory damages and $125 million in punitives. *Id.* at 358. The trial court ordered the plaintiff to file a remittitur of $121.5 million of the punitive damages as a condition of overruling Ford's motion for a new trial. *Id.* The California Court of Appeals held that remittitur of the punitive damages was not manifest abuse of discretion after consideration of the ratio of punitive damages to compensatory damages, the aggravating circumstances, and the wealth of the defendant and its profit generating capacity. *Id.* at 390. Other products liability actions were brought against Ford with similar results. *See, e.g., Ford Motor Co. v. Stubblefield*, 171 Ga.App. 331, 319 S.E.2d 470 (1984)(where $8 million award was an amount necessary to deter manufacturer from repeating its conduct of deferring implementation of safety devices in order to protect its profits).

### 4. Conclusion

After careful consideration of the above cases, the ratio between punitive and compensatory damages, and evidence of the degree of malice and conscious disregard for the safety of others shown by TSA and TEC and all other aggravating circumstances sur-

rounding the companies' conduct, this court finds that the jury's punitive verdict of $67.5 million is grossly excessive. *Fust,* 913 S.W.2d at 49. The amount of the verdict exceeds fair and reasonable compensation for plaintiffs' injuries and damages. § 537.068. The punitive award judgment for $67.5 million is excessive in the amount of $41 million.

An appellate court may not compel remittitur; it may only order a party plaintiff to remit or experience the burden and expense of a new trial. *Milam v. Vestal,* 671 S.W.2d 448, 453 (Mo.App.1984). If the Letzes, therefore, enter a remittitur of $41 million of the judgment against TSA and TEC within fifteen days after the filing of this court's mandate, that judgment will stand affirmed for $29 million, representing $2.5 million in compensatory damages and $26.5 million in punitive damages, as of the date of its original entry; otherwise that judgment is reversed and the cause remanded for a new trial on the issue of damages only.