David and Cindy PROPES,
Respondents,

v.

Mark and Sarah GRIFFITH,
Appellants.

No. WD 57232.

Missouri Court of Appeals,
Western District.

May 2, 2000.

Michael Murphy, Liberty, for appellant.

Mark E. Kelly, Liberty, for respondent.

Before: BRECKENRIDGE, C.J., LOWENSTEIN and SPINDEN, JJ.

HAROLD L. LOWENSTEIN, Judge.

## FACTS

This appeal arises from a judgment in a court-tried case in favor of respondents David and Cindy Propes, assessing actual damages against appellants Mark and Sarah Griffith, and punitive damages against appellant Sarah Griffith individually. The Propes filed a petition for damages against the Griffiths for killing two dogs belonging to the Propes. At the heart of this suit is § 273.030, RSMo 1994, relied upon as a defense to the Griffith's actions which is now set out.

If any person shall discover any dog or dogs in the act of killing, wounding or chasing sheep in any portion of this state, or shall discover any dog or dogs under such circumstances as to satisfactorily show that such dog or dogs has or have been recently engaged in killing or chasing sheep or other domestic animal or animals, such person is authorized to immediately pursue and kill such dog or

dogs; provided, however, that such dog or dogs shall not be killed in any enclosure belonging to or being in lawful possession of the owner of such dog or dogs.

The Propes and the Griffiths are neighbors who live in rural Clay County about 1.5 miles from each other. The Griffiths live on a 40–acre farm and own several types of livestock, including approximately 15 sheep and a horse. The Propes owned two dogs, a yellow Labrador and a Brittany Spaniel. On the evening of April 29, 1998, Mrs. Griffith slept in her truck in order to keep watch on and protect her sheep and her pregnant horse because the sheep had been attacked the previous night of April 28. Two sheep died as a result of the attack. On the morning of April 30 between 8:00 a.m. and 8:15 a.m., Mrs. Griffith saw two dogs in her sheep pasture, at least one of which she believed was her neighbors' dog. Trial testimony indicated that Mrs. Griffith had never seen the dogs on her property before and that the dogs did not attempt to bite or bark at the sheep. Further, Mrs. Griffith's testimony indicated that the sheep were not "baaing" or running, but rather the sheep were bunched against the gate and she saw a large tail sticking up from the middle of the cluster. There was no evidence of any physical injury to any of the Griffiths' sheep. Mrs. Griffith testified as follows:

> I was standing in my horse corral next to the horse barn and looked over towards the pasture in which the sheep were being kept at that time, that the sheep had changed position from my last observation of them, were bunched up against, the sheep that I could see at that point in time were all bunched up against a gate, and there was a large tail sticking up out of them.
>
> ... by the time I got, went to the pickup truck and then went to the gate and opened the gate, the sheep were starting to run. That group of sheep that I was watching at the point in time.

At one point, apparently after she got to the pasture where the sheep were standing, she thought the smaller dog, the spaniel, was chasing an ewe and two lambs along a fence. Mrs. Griffith then entered the pen and was able to separate the dogs from the sheep, grab both dogs' collars, and walk them over to the fence. She put the spaniel into her vehicle and tied the lab up in her shop. Mrs. Griffith then called the Clay County Sheriff's Department and within twenty minutes to an hour, two officers arrived. Mrs. Griffith told the officers she was going to have the dogs euthanized and one of the officers requested that instead Mrs. Griffith give the dogs to them and they would take the dogs to Animal Control. After Mrs. Griffith made it clear that she refused to hand the dogs over, she also informed the officers that she believed the lab belonged to the Propes. When the officers realized Mrs. Griffith would not let them handle the situation, they helped load the lab into her vehicle with the spaniel.

Mrs. Griffith then took the dogs some three miles to her local vet, Dr. Mitts, to be euthanized. However, when Dr. Mitts saw the dogs, he indicated that they were not strays, had collars, and that he believed they belonged to the Propes. He refused to euthanize the dogs. Subsequently, Mrs. Griffith returned home, retrieved her wallet, and then drove 45 minutes to the Plattsburg Veterinarian Clinic. In order for this clinic to put the dogs to sleep, Mrs. Griffith was required to, and did, complete an "euthanasia record." In this record, signed by Mrs. Griffith, the language indicated that she was the owner of the two dogs and that neither dog had bitten any person or animal within the past 15 days. Both dogs were then destroyed. At no time during any of these events did Mrs. Griffith contact the Propes to notify them that she had possession of their dogs, or what had occurred.

On May 1, 1998, Respondent Cindy Propes contacted Mrs. Griffith and inquired as to the location of her dogs. Mrs.

Griffith refused to identify their location nor did she inform her neighbor that the dogs had been killed. At no time did Mrs. Griffith ever telephone the Propes to inform them that she thought their dogs had chased or attacked her sheep, nor did she make a claim for injuries to the sheep. At no time did the Griffiths make any assertion that the sheep lost on April 28 was a result of these dogs.

The only evidence of the value of the dogs came from respondent, David Propes, who testified they were worth $1000 each, based on their hunting abilities.

On May 7, 1998, a week after the Propes' two dogs were destroyed, the Griffiths' sheep were again attacked in a similar manner to the April 28 attack.

The trial court ordered that Mark and Sarah Griffith were jointly and severally liable for $2000 in actual damages as a result of the plaintiffs' loss of their dogs.[1] Additionally, Mrs. Griffith was individually ordered to pay another $4000 in punitive damages for her outrageous actions that showed reckless indifference for the rights of others, and to deter Mrs. Griffith and others from like conduct in the future.

## STANDARD OF REVIEW

■■■ "The decree or judgment of the trial court will be sustained by the appellate court unless there is no substantial evidence to support it, unless it is against the weight of the evidence, unless it erroneously declares the law, or unless it erroneously applies the law." *Murphy v. Carron*, 536 S.W.2d 30, 32 (Mo.1976). When determining the sufficiency of the evidence, an appellate court will accept as true the evidence and inferences from the evidence that are favorable to the trial court's judgment and disregard all contrary evidence. *Am. Family Mut. Ins. Co. v. Fehling*, 970 S.W.2d 844 (Mo.App.1998). An appellate court is to "give considerable

deference to the evidentiary and factual evaluations by the trial court... However, no such deference is given where the law has been erroneously applied." *Estate of Conkle*, 982 S.W.2d 312 (Mo.App.1998). (citations omitted).

## POINTS RELIED ON

■■■ The Griffiths first contend that the trial court erred in awarding a judgment to the respondents because the appellants had a statutory defense for Mrs. Griffith's action of euthanizing the respondents' two dogs in that she "immediately pursued dogs in the act of chasing sheep" pursuant to § 273.030, RSMo. Again, the pertinent portion of the statute states:

If any person shall discover any...dogs in the act of...chasing sheep in any portion of this state, or shall discover any...dogs under such circumstances as to satisfactorily show that such...dogs...have been recently engaged in killing or chasing sheep...such person is authorized to immediately pursue and kill such...dogs;

Prior to this statute, dogs, as property, were more fully protected. This court recognizes that the current statute, enacted in 1877, was amended in 1899 to include the following additional language: "or shall discover any dog or dogs under such circumstances as to satisfactorily show that such dog or dogs has or have been recently engaged in killing or chasing sheep or other domestic animal or animals." A very early case, *Reed v. Goldneck*, 112 Mo.App. 310, 86 S.W. 1104, 1105 (1905), addressed the change and its legislative intent as follows.

[I]t is apparent from the very terms of the statute that it was not the purpose of the Legislature to make the rule more stringent in favor of the dog and against the person charged with the killing thereof, while in a threatening attitude.... It seems clear, when viewed

---

1. The appellants' points on appeal do not raise any question as to Mr. Griffith's liability    for actual damages.

from this standpoint, that we must construe it to mean that it is in part a further act of outlawry against the dog, and that it not only outlaws a sheep-killing dog, but outlaws as well the dog discovered under suspicious circumstances or under circumstances reasonably suspicious.

The *Reed* case held that the defendant dog killer was statutorily protected when he shot the plaintiff's dog when it came on the defendant's property while fox hunting. While the dog was in an enclosure with 175–180 goats and 25 rabbits, the defendant went into his yard and shot the dog. The defendant testified that the dog was not doing anything particularly harmful, but he shot the dog because he thought the dog "was right in a sheep-killing dog's place."

Although the *Reed* case dates from the early 1900's, the Griffiths claim that such caselaw and interpretation of RSMo § 273.030 protects the action Mrs. Griffith took in having the Propes' dogs killed. However, the facts in the case at bar are clearly distinguishable from the facts in *Reed*. In *Reed*, the animals the defendant was protecting from the dog he shot had previously been attacked *by dogs*. In the facts here, there is absolutely no evidence indicating the Propes' dogs, or for that matter that any dog, was the cause of the previous attack on the Griffiths' sheep. Not only did Mrs. Griffith have absolutely no proof that dogs had been the cause of a previous attack on her sheep, but even more, the sheep were attacked again in a similar manner to the first attack a week after she had her neighbors' dogs euthanized. Further, the defendant in *Reed* immediately shot the dog in the pen while it was near the animals so it could not harm them. In the facts here, and even more disturbing to this court, is that Mrs. Griffith had to make more than one attempt and took over three hours to have the Propes' dogs killed. It obviously would have been impossible for the dogs to harm Mrs. Griffith's sheep once she had control over the dogs and they were out of the pen.

The most recent case, and one of the few Missouri cases dealing with the relevant statute since the early 1900's, *Frost v. Taylor*, 649 S.W.2d 264 (Mo.App.1983), dealt with a 15 year old boy who shot the plaintiff's dog when he heard dogs barking in the vicinity of his sheep. The defendant testified that he saw his sheep coming toward him running away from a pack of dogs, and he did not see the dogs, but heard them and fired three shots towards the barking as the dogs were running away from the sheep. One of the bullets killed the plaintiff's dog who was running coyotes with his master. The court held that in order for the defendant to receive protection under § 273.030, "it must be shown that when [the dog] was shot she was either 'in the act of chasing sheep' or had 'recently engaged in ... chasing sheep'." *Id.* at 266. The court held that the evidence did not conclusively establish that the dog was engaged in or had been engaged in chasing sheep when it was shot, because rather, it had been chasing coyotes. *Id.* The trial court awarded the actual damages for the loss of the dog to the plaintiff, and the court of appeals affirmed this decision. *Id.*

Although the facts in *Frost* are not identical to those in the case at bar, the court's analysis in *Frost* shows the nature in which Missouri courts have interpreted § 273.030. The facts there indicated that although it appeared to the defendant that his sheep were running from and being chased by a dog, § 273.030 did not protect him from liability because it could not be conclusively established by the evidence that the sheep were in fact being chased. Likewise, the evidence in the case at bar falls far short of conclusively establishing that the Propes' dogs were chasing Mrs. Griffith's sheep.

The Griffiths also raise the issue that the language in § 273.030 only requires one who shoots a dog under this statute to "immediately pursue" the dog, rather than

requiring one to both "immediately pursue" and "immediately kill" the dog. This court acknowledges that § 273.030 is not a model of draftsmanship and that there is a reasonable statutory interpretation argument in determining whether the word "immediately" modifies or applies only to "pursue" or to both "pursue and kill."

However, the first element in the statute requiring the dogs to be "in the act of killing, wounding or chasing sheep" is dispositive in the case at hand, and therefore, makes the interpretation issue of whether the dogs must be immediately killed irrelevant. With regard to the chasing portion of the statute, the trial court was not bound to believe the portion of Mrs. Griffith's testimony about the spaniel chasing some of the sheep after she arrived. The trier of fact could have very well believed the testimony that the sheep were standing by the fence not appearing agitated with the lab in the middle, and with no visible signs of a chase. That being so, under the scope of review there was insufficient evidence to support the statutory shield for killing the dogs.

This court will not address the statutory interpretation matter, but strongly recommends that the Legislature review and rethink the need for § 273.030, and at the very least amend it to be more clear as to when and how long the killer may take to destroy the dog.

In an effort to encourage and aid legislative review and amendment of § 273.030, this court offers the following analysis of how some other states have drafted their comparable statutes that are less ambiguous than § 273.030 and more suited to present times. The 1987 amendment to Ohio Rev.Code. Ann. § 955.28 is most exemplary of an elucidator change. Previous to 1987, the Ohio statute in relevant part read; "A dog that chases, worries, injures, or kills a person, sheep, lamb, goat, kid, domestic fowl, or domestic animal except a cat or another dog *can be killed at any time or place.*" The 1987 amendment that became effective July 10, 1987 changed this language to the following; "...a dog that chases, injures, or kills livestock, poultry, other domestic animal, or other animal, that is the property of another person, except a cat or another dog, *can be killed at the time of that chasing, approaching, attempt, killing, or injury.*" This change indicates that the Ohio legislature was aware that the protection was too broad in its time frame, and amended the statute to cover only the exact time of chasing or harm.

Other states also have similar less ambiguous statutes that seem more appropriate for present times. *See e.g. Idaho Code § 25-2806* ("Any person, on finding any dog, worrying, wounding, or killing any livestock...may, *at the time of so finding said dog,* kill the same..."); *N.M. Stat. Ann. § 77-1-2* (...it shall be the right of any owner of livestock so killed or injured by the actions of any dog *to kill the dog while it is upon the property controlled by the owner of the livestock* ).

■ Missouri's common law holds that dogs are property and no one has the right to kill or harm them except for just cause. *Gerhart v. City of St. Louis,* 307 Mo. 206, 270 S.W. 680, 682 (1925). No one has the right to shoot a dog on his property merely for being there when the dog is not threatening imminent danger to the person's property. *Reed* at 1105. In light of caselaw, it would be logical to conclude that the legislature did not intend for § 273.030 to allow a sheep owner to have an unlimited time frame in which to kill a dog found on his property, but rather, the purpose of the statute was to allow the landowner to kill the dog immediately while in the act of chasing so as to protect his or her sheep from the immediate danger the dog presented. Though not decisive to the decision in this case, the court believes the statute to require the immediate pursuit *and* immediate killing of the dog. Any other interpretation would lead to what happened here; an extended period of euthanasia shopping.

This court will further point out that although the Appellants chose not to utilize other means of recovery for the loss of their sheep, Missouri, as most states, has statutory recourse for personal property damages including livestock. *See* V.A.M.S. § 537.330. As stated previously, at no time did the Appellants make a monetary claim for the loss of their sheep from the prior attack against the Propes. It should also be noted that § 273.020 allows recovery to the owner for sheep killed, and the destruction of the dogs by their owner.

The trial court found through Mrs. Griffith's own testimony that she had not previously seen the dogs on her property, nor did she ever see the dogs make any attempt to bite or bark at her sheep in the 25 minutes that she claimed to have been in the sheep pen with the animals. Mrs. Griffith further testified that she did not see any blood on the sheep indicating that the dogs had caused injury to the sheep, nor did the sheep ever "baa" as if in distress from an attack. Mrs. Griffith was able to maintain both dogs and lead them out of her pasture and tie them up, indicating no disorder or wild behavior by the dogs.

The judgment of the trial court held that it "clearly was not the circumstance in this case" that the dogs Mrs. Griffith caught on her land were "in the act of killing, wounding or chasing sheep,'" which is required for statutory protection under RSMo § 273.030. The trial court further stated "[t]he plaintiff's dogs were not in any act of attacking sheep. Furthermore, there is no allegation that they ever killed, wounded or chased the sheep."

This court is required to accept as true the evidence and inferences from the evidence that are favorable to the trial court's judgment and disregard all contrary evidence. *Am. Family Mut. Ins. Co., supra.* There was insufficient evidence to prove that the Propes' dogs were chasing the sheep, and therefore, Mrs. Griffith was not statutorily protected in her action of killing the Propes' dogs. The problems inherent in § 273.020 are borne out by the facts of the case at bar. It seems as if this statute is designed to protect sheep and allows the immediate killing of the dogs, and as such, would seem to invite breaches of the peace. The taking of the lives of the dogs some three hours after their discovery in the sheep pen defeats the right under the statute to do what Mrs. Griffith could have done earlier.

What is apparent under these facts is this: Mrs. Griffith did not supply sufficient credible evidence that the dogs were chasing the sheep when she first saw them, and there was no evidence justifying her killing the dogs on the premise that these dogs were responsible for the previous attack. As a result, this point is denied.

■ Appellants' second point alleges that the trial court erred in assessing punitive damages against Sarah Griffith because she was statutorily protected under RSMo § 273.030.

■ "In Missouri, as well as in most jurisdictions, exemplary or punitive damages may be recovered against a wrongdoer where the wrongful acts were perpetrated in a willful wanton or malicious manner.... The test to be applied in determining whether malice existed as a basis for the award of punitive damages is whether the defendant did a wrongful act intentionally...without just cause or excuse... wantonly and with a bad motive...." *McKeehan v. Wittels,* 508 S.W.2d 277 (Mo. App.1974) (citations omitted).

■ "The well established purpose of punitive damages is to inflict punishment and to serve as an example and a deterrent to similar conduct...On appellate review, an abuse of discretion is established when the punitive damage award is so disproportionate to the factors relevant to the size of the award that it reveals 'improper motives or a clear absence of the honest exercise of judgment'...In other words, the amount of punitive damages must somehow be related to the wrongful

act and the actual or potential injury resulting therefrom, although there is no fixed mathematical relation between the amount of actual damages and the amount of punitive damages awarded…In addition, aggravating and mitigating circumstances may be considered…" in all "cases involving punitive damages." *Call v. Heard*, 925 S.W.2d 840 (Mo. banc 1996) (citations omitted). Just as in *Call*, the defendant here makes no claim the punitive award was excessive, but only that there was no justification for the award.

Without the protection of the statute, Mrs. Griffith's actions of shopping for a place to have the dogs destroyed, having been untruthful about her ownership of the dogs, and her lack of notification to the Propes, became relevant to her conduct and the imposition of punitive damages.

Under these facts, the dogs showed no signs of having chased the sheep or of then chasing the sheep, and the longer Mrs. Griffith delayed in taking action, and particularly eschewing the offer of the Clay County Deputy to "be the bad guy" by taking the dogs to Animal Control, displayed clear and convincing proof of malicious, willful, and intentional action that was unlawful and therefore warranted the imposition of punitive damages. *Rodriguez v. Suzuki Motor Corp.*, 936 S.W.2d 104, 111 (Mo.banc 1996); *Hostler v. Green Park Dev. Co.*, 986 S.W.2d 500 (Mo.App. 1999).

In affirming Appellants' first point, this court concluded that § 273.030 was not a statutory defense for Mrs. Griffith's act of killing her neighbors' dogs. Therefore, the trial court properly awarded punitive damages against Mrs. Griffith because as stated in the judgment, "her actions were outrageous, show[ed] reckless indifference for the rights of others, and to deter defendant Sarah Griffith and others from like conduct in the future." Accordingly, the punishment and deterrence of Mrs. Griffith's conduct is the precise reason for assessing punitive damages as indicated above. This court holds that the award of punitive damages was not arbitrary. *Letz v. Turbomeca Engine Corp.*, 975 S.W.2d 155, 174 (Mo.App.1997). Point denied.

## CONCLUSION

The trial judge properly found there was not substantial evidence to show that the Propes' dogs were killing, wounding or chasing the Griffiths' sheep prior to Mrs. Griffith killing the two dogs. As a result, § 273.030 is no defense to Sarah Griffith's action of euthanizing the Propes' dogs. The punitive damages ordered against Mrs. Griffith are appropriate and upheld to punish and deter Mrs. Griffith or anyone else from similar conduct in the future. The judgment of the trial court is affirmed.

All concur.